# IN THE SUPREME COURT OF IOWA

No. 09–0633

Filed December 2, 2011

**STATE OF IOWA,**

    Appellee,

vs.

**MATTHEW JOSEPH ELLIOTT,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

A defendant seeks further review of a court of appeals decision affirming his convictions. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED WITH DIRECTIONS.**

Mark C. Smith, State Appellate Defender, and Robert P. Ranschau, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Thomas S. Tauber and Mary E. Tabor (until withdrawal), Assistant Attorneys General, John P. Sarcone, County Attorney, and Nan M. Horvat, Assistant County Attorney, for appellee.

**WIGGINS, Justice.**

A defendant alleges his convictions should be overturned because the district court admitted hearsay evidence over a proper objection. We transferred the case to the court of appeals. The court of appeals found the evidence was hearsay, but held any error in admitting the tainted evidence was harmless. On further review, we agree with the court of appeals that the evidence in question was hearsay. However, we find the admission of the evidence prejudicial and, therefore, not harmless error. Accordingly, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case for a new trial.

## I. Background Facts and Proceedings.

On June 5, 2007, sixteen-year-old Kristina Gilbert gave birth to Alexis Gilbert. Kristina is one of five children born to Jean Christensen. Kristina's brothers and sisters are Alyssa Gilbert, Matthew Gilbert, Cody Gilbert, and Benjamin (Ben) Christensen. At the time of trial in January 2009, Matthew was twenty years old, and Ben, the youngest, was eight.

Shortly after Alexis's birth, John Hill and Matthew Elliott moved in with Jean, Kristina, Ben, and Alexis at their home in Urbandale. Hill was a friend of the family who had previously lived with Jean, and Elliott was a friend of Hill. Although Jean did not know Elliott, she allowed him to move in because she trusted Hill. Both Elliott and Hill were away without permission from the Fort Des Moines Residential Facility when they started living with Jean and the kids.

In September 2007, Jean, Kristina, Ben, Alexis, and Elliott moved to 513 Eighth Street in West Des Moines. Jean secured the home through the West Des Moines Transitional Housing Program. Although the program stipulated only family members could live in the residence, Jean allowed Elliott to move into the home. Ben split his time living at

his father's house and Jean's house. In early to mid-January 2008, Jean's eldest son, Matthew, also moved into the house. From this point on, Jean, Kristina, Matthew, Alexis, Ben, and Elliott all lived in the home.

Jean made it clear to the family and Elliott that Elliott was to leave the premises when the transitional housing inspector made his monthly inspections. Moreover, Elliott left the premises anytime an authority figure, such as the pediatric nurse, came to the home.

Elliott was unemployed while he resided at Jean's, and it became custom and practice for him to help around the house. In particular, Elliott helped care for Alexis. He performed most aspects of childcare, including feeding and changing Alexis. It was common for Alexis to sleep with Elliott on the living room couch. However, Alexis also slept with other family members from time to time.

On the morning of January 21, an ambulance took Alexis from the house on Eighth Street to the hospital. Emergency room pediatrician Dr. Steven Dawson treated Alexis upon her arrival. Alexis presented completely comatose and had significant swelling on her head, particularly the right side. Dr. Dawson described Alexis's head injury as the worst skull fracture he had ever seen in an infant. He further opined that Alexis's head had been stuck with or against something flat. Alexis died that morning from her injuries.

Police immediately began an official investigation into the cause of Alexis's death. In her statement to police that morning, Kristina claimed Alexis went to bed with her the night before Alexis's death. She claimed that Alexis was fine when she went to sleep and that she found Alexis in her injured condition when she awoke the next morning. She denied having any knowledge as to how Alexis sustained her injuries.

Kristina told this version of the events to a number of people on the morning of January 21, starting with Dr. Dawson at the hospital. She also relayed this version to Susan McManigal, a Department of Human Services social worker; West Des Moines police detectives, Thomas Boyd and Paul Castelline; Michelle Mauro of the Polk County Medical Examiner's Office; and West Des Moines paramedics, Joy Woodward-Drake and David Dhabalt. In her bedroom, Kristina also reenacted her version of the events for Mauro, Detective Castelline, and Dr. Gregory Schmunk, the Polk County Medical Examiner. She explained not only that Alexis had slept with her in bed, but with the help of a doll, she also demonstrated how they had slept.

Kristina's brother, Matthew, told police he went to bed around 2:00 a.m. and that, prior to going to bed, he saw Alexis in the living room with Kristina. He related this story four different times. Specifically, West Des Moines police officer Matthew McCarty testified that Matthew told him he saw Kristina with Alexis at 2:00 a.m. on January 21. Matthew gave the same statement to Mauro, Detective Castelline, and McManigal.

Police also interviewed Kristina's mother, Jean, that morning. Jean's initial statement indicated that before she left the house at 5:15 a.m. she heard baby noises coming from Kristina's upstairs bedroom.

During these morning interviews, Kristina, Matthew, and Jean did not mention Elliott or that he was staying in the home at the time Alexis suffered her injuries. After their morning interviews with Kristina, Matthew, and Jean, the police initially focused their investigation on Kristina's upstairs bedroom, believing it was the crime scene.

Around 12:30 p.m. on January 21, Detective Castelline conducted his initial interview of Ben. He conducted the interview in the presence of Ben's father and McManigal. Detective Castelline did not record the

interview. Ben's story differed from those of the other family members in that he referred to Elliott. In addition to discrepancies as to who was in the home that morning, Ben's story also contained discrepancies regarding the occurrence of certain events.

Ben told Detective Castelline he went downstairs after waking up that morning. Ben said he saw Elliott and Alexis on the couch in the living room and Alexis's head did not look right. Next, Ben related that Elliott told him to go upstairs and get Kristina. Ben told Detective Castelline he woke Kristina and stayed in her bedroom for a period of time. He described how Elliott brought Alexis upstairs to the bedroom, how Kristina left the room briefly, and how Matthew came back with Kristina. Finally, Ben told Detective Castelline that Elliott left the house through the back door where the cars were parked.

Detective Castelline testified that, after he interviewed Ben, the police changed the focus of the investigation from Kristina's bedroom to the first floor living room. On the afternoon of January 21, Detective Castelline summoned Kristina, Matthew, and Jean to the West Des Moines police station for further questioning. Upon arriving at the police station, Detective Castelline separately interviewed Kristina, Matthew, and Jean.

Detective Castelline emphasized to Kristina, Matthew, and Jean that they needed to tell the truth and not worry about concerns they may have had about themselves or other members of the house. He stressed that the investigators knew they were not getting truthful statements as to exactly what happened and who was in the house on the morning of January 21.

In her second interview, Kristina recanted her earlier story. Kristina now claimed she went to bed without Alexis. Furthermore,

Kristina claimed Alexis slept in the living room with Elliott that night. Kristina reported that she went to bed around 9:30 p.m. on January 20 and that Ben woke her up the next morning. Kristina also claimed that, after Ben told her Elliott needed her downstairs right away, she asked Ben to have Elliott come upstairs. Kristina then alleged Elliott came into her bedroom holding Alexis and said, "You got to help me. She's not breathing."

Kristina testified that she screamed at the top of her lungs when she saw Alexis's eye—black, blue, and swollen shut. She ran downstairs to wake Matthew, and they returned upstairs to her bedroom, where Elliott was still with Alexis. Matthew called 911 and initiated CPR on Alexis. Kristina claimed Elliott left after saying, "I got to leave. I can't be here." Kristina said she initially lied that Alexis slept with her because "[Elliott] really wasn't supposed to be at the house" and because she "didn't want people to think that [she] was a bad mom or . . . that [she] had pushed [her] responsibility off on somebody else."

Matthew confirmed this new version of the events. Additionally, Matthew recanted his earlier statements to Officer McCarty, Detective Castelline, Mauro, and McManigal wherein he had stated he went to bed at 2:00 a.m. on January 21. Matthew also recanted his statement to Officer McCarty that he had seen Kristina holding Alexis in the living room at 2:00 a.m.

As Kristina and Matthew had done, Jean also changed her story during her afternoon interview. Initially, Jean reported that she heard baby noises coming from Kristina's upstairs bedroom on the morning of January 21. However, Jean later claimed that, although she originally said she had heard baby noises, she was not one hundred percent certain she had heard them.

At trial, Kristina, Matthew, and Jean gave testimony consistent with the version of events they reported to Detective Castelline on the afternoon of January 21. Furthermore, during their trial testimony, Kristina, Matthew, and Jean all stated their January 21 afternoon interviews were truthful.

Detective Castelline testified twice during the trial. The first time he testified, he stated Ben's interview was inconsistent with the other interviews he conducted. He further testified that based on these discrepancies the focus of the investigation changed. When Detective Castelline first appeared on the witness stand, the State did not ask him to repeat the substance of Ben's interview.

At trial, the State attempted to present Ben's testimony via closed-circuit television. However, Ben was reluctant to respond to the State's questions, claiming he did not remember what he had said to police or in his prior deposition. The State moved to have Ben's deposition testimony admitted into evidence, arguing that Ben was an unavailable witness. The State also argued it could read Ben's deposition testimony into evidence as a recorded recollection. The court ruled against the State, finding Ben was not unavailable and his deposition could not be read into evidence. However, the court agreed to allow the State to recall Ben after the State had an opportunity to refresh his recollection. Elliott's counsel did not cross-examine Ben, and the court released him for the day.

The next day, Elliott's counsel resisted the State's attempt to recall Ben. The court agreed, reversed its prior ruling, and refused to allow the State to recall Ben. The State then asked to recall Detective Castelline to relate what Ben told him when first interviewed on the morning of January 21. The State asserted Detective Castelline's testimony was

necessary, not to prove the truth of the matter asserted, but to explain how and why the focus of the investigation changed. After an offer of proof, and over defendant's objections, the court allowed Detective Castelline to take the stand again. The court ruled the detective's testimony would not come in as substantive evidence, but rather only to show why the detective changed the focus of the investigation.

The court also agreed to instruct the jury that the court admitted the detective's rendition of Ben's statement only for the limited purpose of explaining how and why the focus of the investigation changed and that it was not evidence of the facts asserted. Detective Castelline told the jury the substance of his interview with Ben. Elliott's counsel did not present any further evidence concerning Ben's statement to the detective.

The case went to the jury. Jury instruction number twenty provided:

> You have heard evidence claiming [Ben], a minor child made statements to Detective Castelline before this trial, which were not under oath. You must only consider these statements to determine whether the course of the investigation changed as a result of [Ben's] statements. You are not to consider this evidence to support a fact in issue in this case.

During deliberations, the jury submitted a question to the court asking, "Can we consider the final testimony of Detective Castelline about what Ben C. told the Detective to be evidence in support of fact in this case? We are aware of Instruction # 20." The court replied, "Please read the instructions."

The jury found Elliott guilty of willful injury causing serious injury and child endangerment resulting in death. Elliott filed a notice of appeal. We transferred the case to the court of appeals. The court of

appeals affirmed the judgment of the district court. Elliott asked for further review, which we granted.

## II. Issues.

Elliott raises numerous issues on appeal. The issue as to whether the district court erred in allowing hearsay testimony from Detective Castelline when it allowed him to testify about the substance of Ben's interview is dispositive of this appeal. However, the issue regarding the trial court's exclusion of evidence of a founded 2003 child abuse investigation involving Matthew may reoccur on retrial. Thus, we will discuss both issues.

## III. Scope of Review.

We review hearsay rulings for correction of errors at law "because admission of hearsay evidence is prejudicial to the nonoffering party unless the contrary is shown." *State v. Ross*, 573 N.W.2d 906, 910 (Iowa 1998). We review other evidentiary rulings for an abuse of discretion. *State v. Jordan*, 663 N.W.2d 877, 879 (Iowa 2003).

## IV. Whether the District Court Erred in Allowing Hearsay Testimony from Detective Castelline when It Allowed Him to Testify About the Substance of His Interview with Ben.

To address this issue, we must first determine whether the testimony given by Detective Castelline, wherein he related the statements given to him by Ben, was hearsay. If so, we must then determine whether the admission of this testimony amounted to harmless error.

**A. Whether the Objected-to Testimony Constituted Hearsay.** The court of appeals found this testimony to be hearsay. We agree. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of

the matter asserted." Iowa R. Evid. 5.801(*c*). However, "[w]hen an out-of-court statement is offered, not to show the truth of the matter asserted but to explain responsive conduct, it is not regarded as hearsay." *State v. Mitchell*, 450 N.W.2d 828, 832 (Iowa 1990).

Generally, an investigating officer may explain his or her actions by testifying as to what information he or she had, including its source, regarding the crime and the criminal. *State v. Reynolds*, 250 N.W.2d 434, 440 (Iowa 1977). Yet, this option is not without restraint. "If [an] investigating officer specifically repeats a victim's complaint of a particular crime, it is likely that the testimony will be construed by the jury as evidence of the facts asserted." *State v. Mount*, 422 N.W.2d 497, 502 (Iowa 1988), *overruled on other grounds by State v. Royer*, 436 N.W.2d 637, 639–40 (Iowa 1989).

Our decision in *State v. Doughty*, 359 N.W.2d 439 (Iowa 1984), illustrated this principle. There, the court allowed a police officer to testify as to statements made by a young victim. *Doughty*, 359 N.W.2d at 441. The defendant lodged his hearsay objection; however, the court overruled the objection and allowed the officer to relate the details of the incident. *Id.* On appeal, the State argued the statements were not hearsay, as it did not offer them to prove the truth of the matter asserted. *Id.* Instead, the State argued it offered the challenged evidence to explain the officer's subsequent actions. *Id.*

While we acknowledged the admissibility of such testimony in certain circumstances, we stated its admissibility was limited. *Id.* at 442. In *Doughty* we noted,

> "In criminal cases, the arresting or investigating officer will often explain his going to the scene of the crime or his interview with the defendant, or a search or seizure, by stating that he did so 'upon information received' and this of

course will not be objectionable as hearsay, but if he becomes more specific by repeating definite complaints of a particular crime by the accused, this is so likely to be misused by the jury as evidence of the fact asserted that it should be excluded as hearsay."

*Id.* (quoting *C. McCormick's Handbook on the Law of Evidence* § 248, at 587 (2d ed. E. Cleary 1972)); *see also People v. Trotter*, 626 N.E.2d 1104, 1112–13 (Ill. App. Ct. 1993) ("Although a police officer may reconstruct the steps taken in a crime's investigation and may describe the events leading up to the defendant's arrest where such testimony is necessary and important to fully explain the State's case to the jury, there is a distinction between an officer testifying to the fact that he spoke to a witness without disclosing the contents of that conversation and an officer testifying to the contents of the conversation." (Citation omitted.)).

We further cautioned, "[T]he proffered evidence here approaches the line of inadmissibility drawn by these authorities because it went beyond the point of merely explaining why certain responsive actions were taken by the officers." *Doughty*, 359 N.W.2d at 442. We further stated, "On retrial, we assume the State will limit the officer's testimony accordingly and will rely on the first-hand testimony . . . to furnish the additional details." *Id.*

It is up to the trial court to determine "whether the statement is truly relevant to the purpose for which it is being offered, or whether the statement is merely an attempt to put before the fact finder inadmissible evidence." *Mitchell*, 450 N.W.2d at 832; *accord State v. Hollins*, 397 N.W.2d 701, 705–06 (Iowa 1986). To determine if an alleged hearsay statement is admissible, we must analyze the purposes for which it was offered. *State v. Sowder*, 394 N.W.2d 368, 371 (Iowa 1986); *State v. Horn*, 282 N.W.2d 717, 724 (Iowa 1979). In analyzing the statement, we look "at the *real* purpose for the offered testimony, not just the purposes

urged by the prosecutor." *Sowder*, 394 N.W.2d at 371. We base our determination on "an objective finding based on the facts and circumstances developed by the record." *Id.*

The State argued its purpose in recalling Detective Castelline was to allow the detective to explain why he changed the focus of the investigation based on what Ben told him during Ben's first interview. When the State first examined Detective Castelline, the detective stated he changed the focus of the investigation due to inconsistencies between Ben's initial statement and the initial statements of the others who were present in the home the night Alexis suffered her injuries. At that time, the State did not deem it necessary to elicit the substance of Ben's statement from the detective to establish why the detective changed the focus of the investigation. The mere fact that inconsistencies existed in the witnesses' statements was sufficient to show why the focus of the investigation changed. Only after the court ruled that the State could not call Ben as a witness did the State have the detective relate the substance of Ben's statement to the jury.

The substance of Ben's testimony went well beyond what was necessary to explain why the detective changed the focus of the investigation. *Cf. id.* ("By bringing out the specific statements made, not merely focusing on the fact a conversation occurred, the State attempted to establish the truth of the facts asserted in the conversation . . . ."). The State offered the testimony regarding the detective's initial interview of Ben to put the substance of Ben's interview into evidence. Thus, the testimony was hearsay, and the court should not have allowed the detective to relate to the jury the substance of Ben's original interview.

**B. Whether the Admission of This Hearsay Evidence Constituted Prejudicial Error**.

1. *Cumulative evidence.* The State argues, and the court of appeals agreed, the admission of the substance of Ben's original interview was not prejudicial because it was merely cumulative. On our review of the record, we agree that the hearsay testimony pertaining to the substance of Ben's original interview was cumulative because it was consistent with the testimony and statements given by Jean, Kristina, and Matthew after the police refocused the investigation. Nonetheless, we find that its admission prejudiced the defendant's substantive rights.

"[A]dmission of hearsay evidence over a proper objection is presumed to be prejudicial error unless the contrary is affirmatively established." *State v. Nims*, 357 N.W.2d 608, 609 (Iowa 1984). The contrary is affirmatively established if the record shows the hearsay evidence did not affect the jury's finding of guilt. *Id.* One way to show the tainted evidence did not have an impact on the jury's verdict is to show the tainted evidence was merely cumulative. *State v. Hildreth*, 582 N.W.2d 167, 170 (Iowa 1998).[1] If the record contains cumulative evidence in the form of testimony, the hearsay testimony's trustworthiness must overcome the presumption of prejudice. *Horn*, 282 N.W.2d at 724. We measure the trustworthiness of the hearsay testimony based on the trustworthiness of the corroborating testimony. *See id.*; *State v. Johnson,* 272 N.W.2d 480, 482–83 (Iowa 1978).

---

[1]Another way to show the tainted evidence did not affect the jury's verdict is to show other overwhelming evidence of the defendant's guilt, making the prejudicial impact of the tainted evidence insignificant. *State v. Hallum*, 585 N.W.2d 249, 256 (Iowa 1998), *cert. granted, judgment vacated on other grounds*, 521 U.S. 1001, 119 S. Ct. 2335, 144 L. Ed. 2d 233 (1999). Because the State did not make this argument, we will not address it in our opinion.

For example, in *Johnson* we held the hearsay evidence was extremely trustworthy and its admission constituted harmless error because twelve witnesses, including the defendant, all gave testimony corroborating the same line of testimony without objection. 272 N.W.2d at 481–83. Similarly, in *State v. Webb,* 309 N.W.2d 404 (Iowa 1981), a witness gave hearsay testimony that the defendant's brother called him and told him that he was in possession of a handgun following the alleged commission of an armed assault in which the victim later died. 309 N.W.2d at 407, 410–11. The witness further testified the brother brought the handgun to the witness's farm. *Id.* at 411. We found "a multiplicity of substantially the same evidence" where several other witnesses corroborated the existence of the handgun, including the witness's father-in-law who testified he found the gun, buried it, and the defendant's brother later took custody of it when he dug it up. *Id.* The witness who gave the hearsay testimony also gave other admissible testimony establishing the defendant's brother had delivered the handgun to his farm. *Id.*

In contrast, in *Horn* we held the hearsay evidence, although cumulative, was inadmissible because the corroborating testimony lacked the same degree of trustworthiness as the corroborating evidence in *Johnson*; therefore, the admission of the hearsay evidence constituted prejudicial error. 282 N.W.2d at 724–25. The hearsay evidence in *Horn* lacked the same degree of trustworthiness because only one other witness gave testimony corroborating the hearsay evidence and that witness was in jail on charges related to the same murder for which the defendant was charged. *Id.* at 724. Furthermore, that witness had reached an agreement with the county attorney in exchange for his testimony. *Id.*

As in *Horn*, we cannot say the hearsay evidence in this case was trustworthy to a degree that overcame the presumption of prejudice even though the testimony of three other witnesses corroborated it. As in *Horn*, we have doubts as to the trustworthiness of the corroborating testimony. All three of the witnesses who gave testimony corroborating the hearsay evidence—Jean, Kristina, and Matthew—testified they initially lied to police in their interviews at the house and changed their stories when they gave their second interviews at the West Des Moines police station. While we do not want to invade the province of the jury and opine on which version of the facts, if either, is true, we will note that there is no evidence indicating Jean, Kristina, Matthew, and Ben did not have the opportunity to conspire against Elliott, especially once the police began focusing their investigation in Kristina's bedroom. At that point, Kristina would have had a reason to point the finger at Elliott after realizing she was a potential suspect, if not the primary suspect. This seems even more likely following the reenactment. In addition, Kristina's mother, Jean, and brother, Matthew, would have had similar motives to point the finger at Elliott in order to protect Kristina.

Although we concede Jean, Kristina, and Matthew were not in prison and had not been offered a deal by the State like the corroborating witness in *Horn*, we must point out the potential existed for them to orchestrate a story singling out Elliott as Alexis's killer, especially once police began focusing on Kristina's bedroom as the crime scene. Therefore, we find that the hearsay evidence is not trustworthy to a degree that overcomes the presumption of prejudice because the corroborating testimony is not as trustworthy as the corroborating evidence in *Johnson* or *Webb*.

However, even if we were to find that the hearsay evidence was trustworthy to the point that it overcame the presumption of prejudice, we are still not convinced the admission of the hearsay evidence did not prejudice Elliott. Although courts frequently find the erroneous admission of hearsay evidence constitutes harmless error because it is merely cumulative, that does not mean that all erroneously admitted hearsay evidence is harmless merely because it is cumulative. *See United States v. Bercier*, 506 F.3d 625, 633 (8th Cir. 2007). " 'There could be circumstances . . . where that extra helping of evidence can be so prejudicial as to warrant a new trial.' " *Id.* (quoting *United States v. Ramos-Caraballo*, 375 F.3d 797, 802–03 (8th Cir. 2004)). One such circumstance occurs when a witness's credibility is central to the case and the only real purpose for admitting the hearsay evidence is to bolster that witness's credibility. *Id.*; *see also Coates v. State*, 930 A.2d 1140, 1163–64 (Md. Ct. Spec. App. 2007) (holding that where a seven-year-old girl's credibility was central to the case, a nurse practitioner's testimony regarding statements the girl made during a medical examination fourteen months after an alleged rape were inadmissible because it corroborated important portions of the girl's testimony).

In *Bercier*, the Eighth Circuit determined the district court's error in admitting a treating physician's testimony and hospital notes regarding the victim's statement that the defendant had sexually assaulted her was prejudicial to the defendant's substantive rights. 506 F.3d at 633. During the victim's sexual assault exam, the physician engaged in a lengthy interview with the victim, in which the physician inquired into the identity of the assailant and the details of the alleged assault. *Id.* at 632. The hearsay testimony and notes also included the

victim's accusations that the defendant had a history of violence and substance abuse. *Id.* at 633.

The court noted that although the rules of evidence normally exclude statements made by a patient seeking medical diagnosis or treatment from the hearsay rule, the government did not offer the physician's testimony under the exception. *Id.* at 632. Furthermore, the court could not discern a "relationship between diagnosis and treatment and [the victim's] detailed description of the encounter to [the physician]." *Id.* Because the case turned on the credibility of the victim and the defendant as witnesses and because the hearsay testimony confirmed the victim's description of the alleged sexual assault, the court determined the only purpose in having the physician testify was to bolster the victim's trial testimony. *Id.* at 633. The court concluded the hearsay testimony unfairly tipped the scales towards the defendant's guilt in such a way as to warrant a new trial. *Id.*

In this case, the issue for the jury was whether Alexis received her injuries upstairs while sleeping with Kristina, as originally reported to the police, or downstairs while sleeping with Elliott. If Alexis received her injuries upstairs, then the evidence pointed to Kristina as the perpetrator; however, if Alexis received her injuries downstairs, then the evidence pointed to Elliott. As the defense noted in its closing argument,

> And so the big fight here, as you know, is whoever had her is the one that would have caused her death. You know that's the issue here. So that's the big debate. Who had her? The State wants you to believe Matthew Elliott had her, but we can show you evidence that Kristina Gilbert had her. And Kristina Gilbert killed her own child.

Due to the lack of direct evidence in this case, it is clear from the record the outcome depended on the credibility of the State's four key

witnesses—Jean, Kristina, Matthew, and Ben—all of whom lived in the house and slept there the night Alexis received her injuries.

During the State's closing argument, the State spent considerable time attacking the credibility of Jean, Kristina, and Matthew, all of whom had admitted to originally lying to police. All three had given statements to the police that were inconsistent with Ben's initial interview. The State discussed a jury instruction pertaining to the credibility of witnesses. Addressing the jury, the State noted that in this instruction "the Judge talked with you about how do you decide who to believe."

The State went on to describe Jean, Kristina, and Matthew as a "whole group of people who live in the shadows and hope you don't notice." After painting a vivid picture of Alexis's injuries, the State began attacking the credibility of Jean, Kristina, and Matthew by stating the following:

> When you think about that, you have to then put that in the context of how do I believe these people who were responsible for Alexis? What about them? You know, they're really kind of not likeable, right? I mean, they lied. And if you stop your analysis there, then you have not done justice to Alexis or to the laws of the State of Iowa because that credibility instruction says go further. See if you can reconcile the evidence, if at all.

The State further described Kristina as an irresponsible sixteen-year-old under stress who "doesn't want to really have the day-to-day responsibilities of being a mom." It further attacked Matthew's credibility by describing him as a visitor to the house who "probably has been there for some time under the guise of looking for a job, but can't quite get out of bed." Lastly, the State attacked Jean's credibility as someone who "pretty much has no idea what is going on in her house because she leaves every day early in the morning." It further noted Jean was the kind of person who, "based upon the word of their friend, the criminal,

John Hill, takes in the defendant, Matthew Elliott, who you know is wanted, an escapee and is hiding."

The State continued in its closing argument by describing Alexis as "the football that keeps going back and forth" in a house of irresponsible adults. It further described Alexis as a baby who "lives in a house where people were so stressed out and so lackadaisical that they smoke around her, even though she has respiratory problems" and noted that she "co-sleeps with everyone." It described the testimony of Jean, Kristina, and Matthew as reconciling that "the baby gets dropped at . . . Elliott's feet." Not only did the State attack Jean, Kristina, and Matthew as irresponsible adults who shifted the burdens of caring for a baby, but it also attacked them as people who were not intelligent enough to realize Elliott was taking advantage of them until he had someplace better to go.

The State reminded the jury that Jean, Kristina, and Matthew all initially lied to police and "directed the police upstairs in order to cover for their friend." It then noted everything changed the moment police interviewed Ben and described Ben as "the little boy who lives in the house who is really kind of sent away to play video [games]," but who also first mentioned Elliott. Not only did the State not attack Ben's credibility, but it described him in a way that allows one to infer innocence and credibility. This is clearly an attempt by the State to show that Ben is a credible witness just after heavily attacking the credibility of Jean, Kristina, and Matthew.

Given that the outcome of the case depended entirely on the credibility of these witnesses, it is evident the sole purpose the State could have had for introducing Ben's hearsay testimony was to bolster the credibility of Jean, Kristina, and Matthew, who all admitted they changed their stories. Ben, who Detective Castelline interviewed later in

the morning, was the only witness who did not change his story, and he was too young to have any responsibility in taking care of Alexis. The State attacked the credibility of Jean, Kristina, and Matthew, but not the credibility of Ben. In essence, the State was painting Ben as a credible witness who confirmed the testimony of its three less credible witnesses. In addition, the dynamics of the way the case was tried did not allow the defendant to test Ben's credibility through cross-examination.

We are sympathetic to the State's argument that the judge's rulings forced the State to try the case in this manner. However, in determining whether the error is harmless, we must base our analysis on the evidence upon which "the jury actually rested its verdict." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S. Ct. 2078, 2081, 124 L. Ed. 2d 182, 189 (1993) (internal quotation marks omitted). In other words, in determining whether prejudice existed, we have to look at the case as tried, and not as the parties could or should have tried it.

Because the entire case turned on the credibility of Jean, Kristina, Matthew, and Ben, the improper admission of the substance of Ben's interview as hearsay evidence, although merely cumulative, was prejudicial to Elliott's substantive rights because it unfairly tipped the scales towards Elliott's guilt.

2. *Other theories of admissibility.* In the alternative, the State argues we should affirm the conviction because the court should have admitted the substance of Ben's statement under another theory of admissibility, and therefore, it was not prejudicial. *See DeVoss v. State*, 648 N.W.2d 56, 62 (Iowa 2002) (adopting an exception to the general rule of error preservation when dealing with evidentiary rulings). The State argues the court erred when it failed to allow Ben to testify. In the alternative, the State claims Detective Castelline's testimony relating the

substance of Ben's initial interview was admissible as a nonhearsay statement or under an exception to the hearsay rule.

The State contends the admission of Detective Castelline's statement was harmless error because the same testimony would have been admissible under Iowa Rules of Evidence 5.612, 5.801(*d*)(1)(A), and 5.803(5). Rule 5.612 allows a person to refresh his or her memory while or before testifying. Iowa R. Evid. 5.612. Once refreshed, the witness may testify as to his or her refreshed recollection subject to cross-examination.

Rule 5.801(*d*)(1)(A) provides that prior statements made by witnesses are not hearsay and are admissible as substantive evidence. *Id.* r. 5.801(*d*)(1)(A). However, for a prior inconsistent statement to be admissible, the declarant must testify at trial and be subject to cross-examination. 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 801.20[2], at 801–26.4 to 801–27 (Joseph M. McLaughlin ed., 2d ed. 2004).

Finally, rule 5.803(5) contains an exception to the hearsay rule and states:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly.

Iowa R. Evid. 5.803(5). As the State acknowledges in its brief, the witness must state under oath that the prior statement was accurate and the witness should be subject to cross-examination on that point. *See State v. Thompson,* 397 N.W.2d 679, 683 (Iowa 1986).

The common thread to the admissibility of the substance of Ben's interview under rules 5.612, 5.801(*d*)(1)(A), and 5.803(5) is that Ben must appear as a witness to provide the proper foundation and be subject to cross-examination. Moreover, even if these rules allowed the court to admit Ben's interview, the testimony would be admitted as substantive evidence and its admissibility would violate Elliott's right to confrontation under the Confrontation Clause[2] because Ben was not subject to cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L. Ed. 2d 177, 203 (2004) (holding the Confrontation Clause prohibits the use of testimonial hearsay evidence unless the declarant testifies at trial or the right to confrontation is otherwise sufficiently honored).[3] Therefore, if the evidence was admitted under one of these rules, it would have still prejudiced Elliott because he did not have the opportunity to confront Ben after he knew the court was going to admit Ben's statement through Detective Castelline's testimony.

Here, the court refused to allow the State to recall Ben as a witness in order to provide the proper foundation or be subject to cross-examination. A trial court has very broad discretion to permit or refuse a party from recalling a witness. *State v. Tangie*, 616 N.W.2d 564, 572 (Iowa 2000). On our review of the record, we find that the court did not abuse its discretion in refusing to allow the State to recall Ben.

---

[2]The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI.

[3]The way the case was tried, Elliott did not need to object to this evidence as a violation of the Confrontation Clause because the court did not admit the substance of the interview for the truth thereof, but only to show why the detective changed the focus of the investigation.

Therefore, the State cannot use rules 5.612, 5.801(*d*)(1)(A), and 5.803(5) to show the error was harmless.[4]

### V. The Trial Court's Exclusion of Evidence of a Founded 2003 Child Abuse Investigation Involving Matthew.

The court of appeals did not reach the merits of this issue. Instead, it found the exclusion constituted harmless error because Elliott did not argue Matthew perpetrated the crime. We find this reasoning to be circular. An attorney can only argue a theory of the case from the evidence admitted at trial. *State v. Phillips*, 226 N.W.2d 16, 19 (Iowa 1975). In doing so, an attorney may argue the reasonable inferences and conclusions he or she can draw from the evidence. *Id.*

Here, the district court did not allow evidence into the record of a prior child abuse investigation involving Matthew. Thus, the record did not contain the evidence necessary for Elliott to make the argument the court of appeals said he should have made. In any event, we are remanding the case for a new trial.

Elliott contends evidence of the investigation is admissible under Iowa Rule of Evidence 5.404(*b*). Rule 5.404(*b*) applies to persons other than the defendant. *See, e.g., Connelly v. Hyundai Motor Co.*, 351 F.3d 535, 546–47 (1st Cir. 2003) (applying Federal Rule of Evidence 404(b) to the prior act of the decedent's parent in a wrongful death action).

---

[4]Although a limiting instruction may alleviate the danger of unfair prejudice, *State v. Bayles*, 551 N.W.2d 600, 607–08 (Iowa 1996), in some circumstances, limiting instructions are inadequate to cure prejudice from the erroneous admission of evidence, *see, e.g., State v. Sowder*, 394 N.W.2d 368, 371–72 (Iowa 1986). Here, the State did not argue that the limiting instruction cured any prejudice to Elliott caused by the admission of the hearsay evidence. Even if it had, under the facts of this case the limiting instruction would not have cured the error. *See State v. Martin*, 587 N.W.2d 606, 610 (Iowa Ct. App. 1998) (holding a judge's limiting instruction did not nullify the danger of unfair prejudice when there was no other evidence of the inadmissible hearsay). As discussed in this opinion, the prior statements of Jean, Kristina, and Matthew controverted Ben's version of the events.

On retrial, the court should analyze this evidence under rule 5.404(*b*). Rule 5.404(*b*) is a rule of exclusion. *State v. Sullivan,* 679 N.W.2d 19, 24 (Iowa 2004). Rule 5.404(*b*) contains examples of noncharacter theories for the admissibility of evidence of prior wrongs or acts. They include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Iowa R. Evid. 5.404(*b*).

In order for this evidence to be admissible, Elliott must articulate a noncharacter theory of relevance. *See Sullivan,* 679 N.W.2d at 28. If Elliott establishes a noncharacter theory, then the court must determine whether the evidence of other wrongs or acts "is relevant and material to a legitimate issue in the case, other than a general propensity to commit wrongful acts." *State v. Cox,* 781 N.W.2d 757, 761 (Iowa 2010) (emphasis and internal quotation marks omitted). If the court determines the evidence is relevant and material to a legitimate issue in dispute, then the court must determine whether the probative value of the evidence of the other wrongs or acts is substantially outweighed by the danger of unfair prejudice to the State. *Id.* In doing so,

> the court should consider the need for the evidence in light of the issues and the other evidence available to the [defendant], whether there is clear proof [Matthew] committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*State v. Taylor,* 689 N.W.2d 116, 124 (Iowa 2004). The court must exclude the evidence if the evidence's probative value is substantially outweighed by the danger of unfair prejudice. *State v. Mitchell,* 633 N.W.2d 295, 298–99 (Iowa 2001). The better practice is for the court to make explicit findings under the balancing test on the record. *See State*

*v. Redmond*, 803 N.W.2d 112, 118–19 (Iowa 2011) (encouraging a court to make explicit findings concerning the balancing test articulated in rule 5.609(*a*)(1)). We leave this analysis to the court on retrial because the court can only apply the balancing test, if applicable, in light of the record made at retrial.

## VI. Disposition.

We vacate the decision of the court of appeals, reverse the judgment of the district court, and remand for a new trial with directions because the trial court admitted hearsay evidence and its admission constituted prejudicial error.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED WITH DIRECTIONS.**

All justices concur except Mansfield, J., who takes no part.