**IN THE COURT OF APPEALS OF IOWA**

No. 14-1393
Filed November 12, 2015

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**JAMES CAIN HARRIS,**
     Defendant-Appellant.
_____

     Appeal from the Iowa District Court for Pottawattamie County, Gregory W.

Steensland, Judge.

     James Harris appeals his conviction for murder in the first degree.

**AFFIRMED.**

     Mark C. Smith, State Appellate Defender, and Theresa R. Wilson,

Assistant Appellate Defender, for appellant.

     Thomas J. Miller, Attorney General, and Kevin Cmelik and Mary A. Triick,

Assistant Attorneys General, for appellee.

     Heard by Vogel, P.J., and Vaitheswaran and Bower, JJ.

**BOWER, Judge.**

James Harris appeals his conviction for murder in the first degree. Harris claims insufficient evidence exists to support the denial of his motion for judgment of acquittal, the district court erred by allowing inadmissible hearsay, the district court abused its discretion by admitting certain evidence, and his counsel provided ineffective assistance. We affirm Harris's conviction.

## I.    BACKGROUND FACTS AND PROCEEDINGS

In the early morning hours of July 31, 2003, the residents of an apartment in Council Bluffs heard loud noises outside accompanied with someone "beating" on the front door as though they were trying to get in. Jim Miles braced himself against the door and yelled for Doris Hightree and his wife, Angel Miles, to call the police and both women did so. Jim testified he heard "yelling and screaming" outside, and the statement "Stephanie, you fucking bitch, open that damn door." He heard the statement several times. Jim's children, Sha'na and Heather, witnessed the incident.

Sha'na, who was eight years old at the time, testified she heard yelling and looked outside through a picture window located next to the front door. She saw a man "standing outside with a blue shirt on, a blue tank top." She guessed the man was of Hispanic origin, "heavy set," with a long braided ponytail. The man was yelling "Stephanie" and pointing at Sha'na's mother, Angel. Sha'na heard other voices but could not identify what they were saying.

Heather, who was ten years old at the time, testified she saw a "black guy with dark hair" dressed in a blue tank top and jeans. The man was kicking

another person "kind of by the door." She could "hear other people" but could not see anyone else outside.

The first police officer who arrived at the apartment observed a car "parked at an angle, partially blocking the street in front of the residence." The officer then saw an individual "laying on the concrete" and "thrashing around" in front of the apartment's porch. The porch light illuminated a "large pool of blood on the ground." The victim was still alive but "looked close to death." Subsequently, paramedics arrived and transported the victim to a local hospital where she later died.

After the victim's death, the police "spent a good portion of time" identifying the victim. The police eventually determined the victim was Salena (a/k/a Nelson)[1] Alvarez Hernandez. Using the evidence found at the scene, the police were able to retrace Hernandez's actions the night of her murder. That night, Hernandez got off work at Greater Omaha Packing at approximately 10 p.m. and then went to a bar, LaCarreta, located a few blocks from her work. The door people at LaCarreta stated Hernandez left the bar between 11:30 and midnight. In 2003, the police were unable to determine Hernandez's whereabouts from midnight to the time of the stabbing at 2 a.m.

---

[1] The victim's legal name was Nelson Alvarez Hernandez, though the victim was transgender and identified as female. The victim's friends and associates knew her as Salena. Therefore, this opinion will refer to the victim as Salena and use female pronouns. *See e.g. Responding to Transgender Victims of Sexual Assault,* Office for Victims of Crime (June 2014)*,* http://www.ovc.gov/pubs/forge/tips_language.html (discussing the importance of using preferred names and pronouns when working with transgender crime victims).

Through Hernandez's employment records and the registration on the car found at the scene of the stabbing, the police were able to locate her apartment. An officer testified the apartment "was basically abandoned. No furniture in there to speak of. Other than a couple—there was empty beer bottles and beer cans, which were photographed and collected." The police also learned Hernandez was an active drug user, potentially a drug dealer, was openly homosexual, and went by many different aliases. The police investigated the case for the following three to four months, but their leads proved unsuccessful and, by November 2013, the case went cold.

In 2006, Harris's half-brother, Anthony Francis (a/k/a Cortez), contacted the police and claimed he had knowledge of an individual who had committed murder, specifically a case that "had to do with a Mexican homosexual." As a result, the police began to focus their investigation on Harris.

The police ran a query of their records management system to determine where Harris lived and who he associated with at the time of the murder. The query revealed Harris had associated with Stephanie Strange. The police located Strange and conducted a recorded interview. Based on the information from the interview, the police acquired a court order to obtain Harris's DNA. The police needed Harris's DNA to determine if it matched the blood on a five dollar bill found at the scene of the stabbing. Once Harris's DNA was tested, and it did not match the blood found on the bill, the case again went cold.

In 2013, the police again resumed investigating the murder when the Combined DNA Index System, returned a DNA match for the blood on the five

dollar bill. The blood matched an individual who was already incarcerated; he denied knowing anything about the murder.

The police then decided to re-interview Strange. Strange's 2013 interview was consistent with her 2006 interview, and the police again began looking at Harris as a suspect. Based on the information provided by Strange in her two interviews and the information from Francis, the police obtained an arrest warrant for Harris.

The police arrested Harris in March 2014, and charged him with murder in the first degree, pursuant to Iowa Code sections 707.1, 707.2(1) and (2) (2003). Harris pleaded not guilty. After informing Harris of his *Miranda* rights, the police questioned Harris for approximately five hours. Harris initially denied knowing Hernandez or having any involvement in the murder; however, over the course of the interview, he began to recall details from the night of the murder. Towards the end of the interview, Harris admitted to being with Hernandez the moment she was stabbed, though he claimed an unknown man outside the apartment did the stabbing after an altercation with Hernandez. Harris's statement was corroborated by physical evidence found at the crime scene, as well as testimony by the residents of the apartment and Strange.

A jury trial was held on June 24, 2014, and the jury found Harris guilty as charged. The district court held a sentencing hearing on August 20, and sentenced Harris to life in prison without the possibility of parole. Harris appeals.

## II.     STANDARD OF REVIEW

A motion for judgment of acquittal is a means of challenging the sufficiency of the evidence, and we review such claims for correction of errors at law.  *State v. Serrato*, 787 N.W.2d 462, 465 (Iowa 2010)*.*  "Evidence is sufficient to withstand a motion for judgment of acquittal when, viewing the evidence in the light most favorable to the State and drawing all reasonable inferences in the State's favor, 'there is substantial evidence in the record to support a finding of the challenged element.'"  *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005) (quoting *State v. Bayles*, 551 N.W.2d 600, 608 (Iowa 1996)).  "Substantial evidence is that upon which a rational trier of fact could find the defendant guilty beyond a reasonable doubt."  *State v. Hagedorn*, 679 N.W.2d 666, 668–69 (Iowa 2004).  In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State.  *Id.*  We give consideration to all of the evidence, not just that which supports the verdict, including reasonable inferences which could be derived from all the evidence.  *Id.*

We review the district court's evidentiary rulings for an abuse of discretion.  *State v. Putman*, 848 N.W.2d 1, 8 (Iowa 2014).  However, we review Harris's hearsay claims for errors at law.  *State v. Newell*, 710 N.W.2d 6, 18 (Iowa 2006).

Ineffective-assistance-of-counsel claims are reviewed de novo.  *State v. Ambrose*, 861 N.W.2d 550, 555 (Iowa 2015).  We look to see whether under the entire record and the totality of the circumstances counsel's performance was within the range of normal competency.  *Id.*  The inquiry is transformed into an individualized fact-based analysis.  *Id.*

## III.   DISCUSSION

### A.   Denial of Harris's Motion for Judgment of Acquittal

During Harris's motion for directed verdict and judgment for acquittal, he claimed the State failed to provide sufficient corroboration to support his 2003 confession to his then-girlfriend Strange.  The State countered that Strange's testimony, Harris's 2014 police interview, and physical evidence provided sufficient corroboration.  The court found the State met its burden of presenting a prima facie case and denied Harris's motion.

"The confession of the defendant, unless made in open court, will not warrant a conviction, unless accompanied with other proof that the defendant committed the offense."  Iowa R. Crim. P. 2.21(4); *see also Opper v. United States*, 348 U.S. 84, 91 (1954).  It is the court's duty to determine the existence of corroborative evidence.  *State v. Polly*, 657 N.W.2d 462, 467 (Iowa 2003).  Corroborative evidence need not address every element of the crime charged.  *Id.*  Corroboration need not be strong, so long as it confirms some material fact connecting the defendant with the crime.  *Id.*  "Other proof" does not have to prove the offense beyond a reasonable doubt or even by a preponderance of the evidence.  *Id.*  "Although individual items of circumstantial evidence may be insufficient corroboration, the combination of the circumstances may permit a jury to conclude the confession . . . was corroborated."  *State v. Liggins*, 524 N.W.2d 181, 187 (Iowa 1994).

Harris notes Iowa courts have not addressed the issue of whether a defendant's extrajudicial statements can corroborate other extrajudicial

statements and confessions by the defendant. As there is other sufficient corroborating evidence independent of Harris's statements, we decline to address this issue on appeal.

The State highlights, persuasively, multiple items of independent corroborating evidence. First, Strange observed Harris before and after the stabbing. That night, she remembered Harris wore "baby blue sweat pants with a baby blue . . . muscle shirt"—an outfit she had purchased for him. Strange remembers seeing Harris and Hernandez leave the bar together "to get the drugs." Once Strange made contact with Harris after the incident, she observed he was wearing different clothing and had "blood speckles, red speckles on his arms and on his face." Harris and Strange checked into a hotel. Strange testified Harris paid for the room. Harris did not have money prior to that night, but he had money to pay for the room. Upon arriving at the room, Strange observed Harris with a butterfly knife, which she cleaned "red stuff" off of. Strange's personal observations provide sufficient evidence to corroborate Harris was with Hernandez that evening. The fact Strange also observed Harris with "blood speckles" and a butterfly knife covered in "red stuff" immediately after Hernandez's stabbing is strong circumstantial evidence Harris committed the murder.

Second, the observations by the residents of the apartment at the scene of the crime provide other corroborating evidence. Sha'na and Heather both testified they saw either a Hispanic or black heavy set male wearing a blue tank top. Heather saw the man kicking another person near the door. Harris is an

African American male of over 300 pounds, who was wearing a blue tank top the night of the incident. Hernandez was found near the front door of the apartment.

Third, the crime scene and other physical evidence are consistent with Harris's statements. Harris told Strange he had Hernandez drop him off near his mother's house but not at the house because Harris did not want Hernandez to know where he lived. Upon arriving in the neighborhood near Harris's mother's house, Harris attempted to rob Hernandez. When Hernandez resisted, Harris stabbed her and fled. Hernandez's car was found at an angle, not fully parked on the side of the street. Hernandez was barefoot (her shoes were in the car) suggesting she had not intended to leave the vehicle. Finally, the crime scene was located near Harris's childhood home and his mother's residence.

Fourth, Harris admitted to non-publically available facts about Hernandez and the crime scene. Harris stated prior to the stabbing Harris and Hernandez went to Harris's apartment, which was essentially empty of furniture. The two drank beer, specifically Bud Lite, at the apartment. After the stabbing, the police searched Hernandez's apartment. They found an empty apartment with a few "empty [Bud Lite] beer bottles and beer cans." Harris also remembered eating jalapeno pickles/vegetables with Hernandez while they were in the car. A pickle/vegetable jar was found at the crime scene.

Fifth, a bloody footprint, consistent with a tennis shoe, was found at the scene of the murder. Harris told the police he wore tennis shoes that night, although he could not remember the brand name. Harris also told police that he cleaned blood off his tennis shoes later that morning.

Harris's statements are accompanied by sufficient corroborating evidence that his admissions do not need to be used to corroborate his earlier confession. Viewing the evidence in the light most favorable to the State, and drawing all reasonable inferences in the State's favor, we find there is sufficient "other proof" to corroborate Harris's statements and affirm the district court's denial of Harris's motion for judgement of acquittal.

**B.      Hearsay Objection**

Harris claims the district court abused its discretion by allowing hearsay evidence, which also violated the Confrontation Clause, when it permitted statements to be admitted about Francis's 2006 interview with the police.

### 1.      Error Preservation

The State claims Harris has failed to preserve error on his confrontation clause claim as Harris's counsel did not raise this as an objection at trial. Harris's counsel objected to the mention of the Francis interview as hearsay because Francis "was not made available during depositions. We don't even know if he's here." Harris's counsel did not raise a Confrontation Clause objection.

"'It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.'" *Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012) (quoting *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002)). "The objection that the question 'calls for hearsay' is too broad to raise the issue of constitutional right of confrontation. Objections to evidence must be sufficiently specific to

inform the trial court of the basis for objecting." *State v. Farni*, 325 N.W.2d 107, 109 (Iowa 1982). Therefore, we find Harris has not preserved error on his Confrontation Clause claim.

Alternatively, Harris claims, if we find the Confrontation Clause claim was not preserved on appeal, he received ineffective assistance of counsel. For the reasons stated below, we find the statements objected to were not hearsay; therefore, Harris's counsel did not breach his duty to Harris by failing to make a Confrontation Clause objection.[2] *See State v. Newell*, 710 N.W.2d 6, 24 (Iowa 2006) ("[T]he Confrontation Clause, like the hearsay rule, does not prevent 'the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" (quoting *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004))).

### 2. Hearsay

Harris claims the district court's allowance of the Francis interview to be mentioned at trial was hearsay because Francis was not available for depositions, and the content of Francis's testimony was offered to prove Harris committed the murder.

"'Hearsay' is a statement, other than one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Iowa R. Evid. 5.801(c); *Newell*, 710 N.W.2d at 18. However, "[w]hen an out-of-court statement is offered, not to show the truth of the matter asserted but to explain responsive conduct, it is not regarded as hearsay." *State*

---

[2] An ineffective-assistance-of-counsel claim requires a showing by the claimant that trial counsel failed to perform an essential duty for the claimant and the failure caused the claimant prejudice. *State v. Thorndike*, 860 N.W.2d 316, 320 (Iowa 2015).

*v. Mitchell*, 450 N.W.2d 828, 832 (Iowa 1990). It is up to the trial court to determine "whether the statement is truly relevant to the purpose for which it is being offered, or whether the statement is merely an attempt to put before the fact finder inadmissible evidence." *Id.* To determine if an alleged hearsay statement is admissible, we must analyze the purposes for which it was offered. *State v. Sowder*, 394 N.W.2d 368, 371 (Iowa 1986).

Here, Lieutenant Flores and Officer Clark testified about their encounters with Francis in 2006. Flores testified about his first contact with Francis, which drew an objection from Harris's counsel:

> Q: Okay. And so did he tell you what the subject—you said he was distraught and upset and had been crying. Did he tell you what the subject matter or the reason for the call was? A: Yes, he knew—He had knowledge of an individual who had committed a murder.
> Q: Okay. And did he—What did you say in response to that? A: I tried to get some more specific information. I said, can you give me some more details?
> Q: And did he then—Were you able to figure out what case he was talking about? A: He said it had to do with a Mexican homosexual.
> Harris counsel: Objection
> The Court: State your objection.
> Harris counsel: It was going to be hearsay testimony at this point. The individual is not—was not made available during depositions. We don't know if he's even here.
> The Court: I'm going to overrule the objection, but I'm going to explain to the jury. Sometimes people get information and they act on it. The information may be true, maybe it is not true. But it explains why you did what you did. The information you've just received from Lieutenant Flores you cannot accept as truthful, but you can accept it as information to explain why he conducted himself in a certain way after he got the information. Go ahead.
> . . . .
> Q: And was he able to provide—and don't give me specifics, but was he able to provide you with information about this murder case? A: Yes he was.

Q: And as a result of the information that he provided to you, did your investigation as the department begin to focus on one individual? A: Yes, it did.

Q: And who did it begin to focus on? A: James Harris.

Q: Was he able to provide details of how that homicide occurred? A: Yes, he was.

Q: And was he able to indicate to you whether or not Mr. Harris was responsible for that death? A. Yes, he did.

Q: So again, not based on whether he's telling the truth or not, but that is what then began your department's investigation shifting the focus to Mr. Harris? A: That's correct.

Officer Clark also testified about his interview with Francis:

Q: All right. And what—I don't want the specifics at this point, but what was the case or the subject matter of this interview? A: Referencing a previous homicide.

Q: And do you recall which homicide? A: Back in 2003, I believe it's Nelson Alvarez Hernandez.

Q: And did Francis indicate that he had some information that pertained to that case? A: Yeah.

Harris counsel: Objection, renew my object from before.

The Court: Which is hearsay?

Harris counsel: Yeah.

The Court: Don't testify to what he said to you, just that you had a conversation and how you reacted to it based on the questions asked; okay?

A: Yes, sir.

. . . .

Q: And as a result of the investigation that received from Anthony Francis, did the investigation focus on a new individual? A: Yes, it did.

Q: And who did it focus on? A: James Harris.

"Generally, an investigating officer may explain his or her actions by testifying as to what information he or she had, including its source, regarding the crime and the criminal." *State v. Elliott*, 806 N.W.2d 660, 667 (Iowa 2011). "If [an] investigating officer specifically repeats a victim's complaint of a particular crime, it is likely that the testimony will be construed by the jury as evidence of the facts asserted." *Id.* We find the testimony regarding the Francis interview

was offered to show why the officers began investigating Harris after the Hernandez murder case had been cold for three years. The testimony was not offered to "prove the truth of the matter asserted"—that Harris murdered Hernandez. Therefore we find the district court did not err.

### C. Admission of Harris's Knives

Harris claims the district court abused its discretion by admitting into evidence various items found on him at the time of his arrest in 2014. Harris claimed the items had no relevance concerning the 2003 stabbing and caused him to suffer prejudice. The State agreed to limit the items admitted into evidence, though the State argued the knives found on Harris should be admitted as any prejudicial effect was limited by the fact Harris admitting to liking and having knives, especially butterfly knives. The State also noted Strange would testify Harris used a butterfly knife to stab Hernandez. The district court determined Strange's proposed testimony and Harris's statements sufficiently linked the knives to the case and the probative value of the knives outweighed the prejudicial value.

The inquiry whether evidence is admissible under our Iowa Rules of Evidence 5.402 and 5.403 involves a two-step inquiry: first, is the evidence relevant? If so, is its probative value substantially outweighed by the danger of prejudice or confusion? *See* Iowa Rs. Evid. 5.402 and 5.403; *State v. Price*, 692 N.W.2d 1, 4 (Iowa 2005). Evidence is relevant if it has a tendency to make a consequential fact more or less probable than it would be without the evidence. Iowa R. Evid. 5.401. Even relevant evidence, however, is not admissible "if its

probative value is substantially outweighed by the danger of unfair prejudice." Iowa R. Evid. 5.403.

For the reasons previously stated in this opinion, the knives found on Harris were relevant and did not cause Harris unfair prejudice. We find the district court did not abuse its discretion in allowing the knives found on Harris to be admitted into evidence.

### D. Ineffective Assistance

Harris claims his counsel provided ineffective assistance by failing to object to statements made by the State during its closing argument. Because Harris's counsel did not object at trial, Harris's claim of prosecutorial misconduct is raised on appeal in the context of an ineffective-assistance-of-counsel claim. *See State v. Graves*, 668 N.W.2d 860, 868 (Iowa 2003).

An ineffective-assistance-of-counsel claim requires a showing by the claimant that trial counsel failed to perform an essential duty for the claimant and the failure caused the claimant prejudice. *Thorndike*, 860 N.W.2d at 320. Typically, we preserve ineffective-assistance claims for postconviction-relief proceedings, but we will address them on direct appeal where the record is adequate. *State v. Bearse*, 748 N.W.2d 211, 214 (Iowa 2008). "The initial requirement for a due process claim based on prosecutorial misconduct is proof of misconduct." *Graves*, 668 N.W.2d at 869. "Evidence of the prosecutor's bad faith is not necessary, as a trial can be unfair to the defendant even when the prosecutor has acted in good faith." *Id.* "The second required element is proof

the misconduct resulted in prejudice to such an extent that the defendant was denied a fair trial." *Id.*

The purpose of closing argument is to assist the jury in analyzing, evaluating, and applying the evidence. *State v. Melk*, 543 N.W.2d 297, 301 (Iowa 1995). An attorney can only argue a theory of the case from the evidence admitted at trial. *Elliott,* 806 N.W.2d at 674. While a prosecutor is afforded the latitude to draw conclusions and argue permissible inferences derived from the evidence in closing arguments, a prosecutor cannot create evidence. *State v. Shanahan*, 712 N.W.2d 121, 139 (Iowa 2006). The test is whether the comments are founded upon relevant evidence or a legitimate inference from the evidence. *State v. Martens*, 521 N.W.2d 768, 773 (Iowa 1994).

During its closing argument, the State referred to Harris as a "performer" or as giving a "performance" to describe Harris's emotional interview with the police. The State also referred to Harris as suffering from "selective amnesia." Upon our review of the record, we find the prosecution's references to Harris do not constitute prosecutorial misconduct. The statements were based on permissible inferences derived from the record. The prosecution began its closing argument by reminding the jury Harris had experience in theater and as a salesman. The prosecution also pointed to Harris's interview where he displayed a large variety of emotions and arguably was acting at times. Due to these facts, we find the prosecution's reference to Harris as a "performer" was permissible and did not amount to misconduct. Additionally, the prosecution's reference to Harris's "selective amnesia" was a fair characterization of Harris's statement,

where at first he denied knowing anything about the stabbing, yet by the end of the interview he admitted to being present at the time of the stabbing. Due to the lack of proof of misconduct, we find the State did not engage in prosecutorial misconduct in its closing argument. *Graves*, 668 N.W.2d at 869. As a result, we find Harris's counsel did not fail to perform an essential duty and was not ineffective. *See Thorndike*, 860 N.W.2d at 320.

## IV. CONCLUSION

We find the district court properly denied Harris's motion for judgment of acquittal as there was sufficient evidence to corroborate Harris's statements and admissions other than the statements Harris made at an earlier date. The district court did not err in finding statements concerning the Francis interview were not inadmissible hearsay, and therefore Harris's counsel did not fail to perform an essential duty by not raising a Confrontation Clause objection. The district court did not abuse its discretion by admitting into the record the knives found on Harris at the time of his arrest in 2014. The probative nature of the evidence outweighed any prejudice to Harris. Finally, Harris's counsel did not provide ineffective assistance by failing to object to statements made by the prosecution during its closing argument as the statements did not rise to the level of prosecutorial misconduct.

**AFFIRMED.**

Vogel, P.J., concurs; Vaitheswaran, J., concurs specially.

**VAITHESWARAN, Judge.** (concurs specially)

I specially concur.

I agree with the majority that we do not need to reach the issue of whether one set of a defendant's extrajudicial statements may corroborate another set of the defendant's extrajudicial statements. My only point of disagreement on the corroboration issue is with the use of Strange's observations to corroborate her narration of Harris's confession. The goal of requiring corroboration of confessions is to ensure the reliability of a confession. *See State v. Polly*, 657 N.W.2d 462, 466 (Iowa 2003). In my view, this goal is not served where the corroboration comes from the very person who recounts the confession. Accordingly, I would discount Strange's observations in determining whether there was sufficient corroboration for the confession she recounted.

Setting aside Strange's observations, I still find sufficient independent corroborating evidence of the confession. While Harris suggests some of the independent evidence was not material, I am persuaded facts such as the discovery of empty beer cans in Hernandez's apartment together with the observations of people at the home where the stabbing occurred satisfied the low threshold for corroborative evidence. *See State v. Liggins*, 524 N.W.2d 181, 187 (Iowa 1994) ("Corroboration need not be strong nor need it go to the whole of the case so long as it confirms some material fact connecting the defendant with the crime.").

I turn to the district court's admission of knives found at the time of Harris's arrest. According to the prosecutor, the knives were offered to show Harris

"like[d]" them. The district court expressed serious reservations about this reason but ultimately admitted the knives, subject to having them linked to the crime. The prosecution did not link them to the crime. No witness established either of the knives found at the time of Harris's arrest was the knife used in the stabbing. Accordingly, I would conclude the knives should not have been admitted. However, I believe the admission of this evidence was nonprejudicial in light of other uncontroverted evidence of Harris's affinity for knives. *See State v. Anfinson*, No. 00-0511, 2002 WL 1426588, at *5-6 (Iowa Ct. App. July 3, 2002) (holding reversal not required where irrelevant evidence erroneously admitted was ultimately cumulative and nonprejudicial).