**IN THE COURT OF APPEALS OF IOWA**

No. 23-1296
Filed March 5, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MATTHEW DEE BUFORD III,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, Kellyann M.

Lekar, Judge.

        A defendant challenges his convictions for two counts of first-degree murder

and flight to avoid prosecution.  **AFFIRMED.**

        Martha J. Lucey, State Appellate Defender, and Maria Ruhtenberg,

Assistant Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant

Attorney General, for appellee.

        Considered by Tabor, C.J., and Ahlers and Sandy, JJ.

**TABOR, Chief Judge.**

"What you gonna do, shoot me in my face? I don't care, I'm not scared." From her upstairs bedroom, thirteen-year-old F.A. heard her mother say those foreboding words before two gunshots rang out on the main floor. When she came downstairs, F.A. saw her mother, Tamica Allison, and her mother's friend, Andrea Anderson, bleeding on the dining room floor. Both women died from gunshot wounds. A jury convicted Matthew Buford of their murders. In this appeal, he challenges the district court's decision to allow those out-of-court statements into evidence. Finding any hearsay violation harmless, we affirm Buford's convictions.

## I. Facts and Prior Proceedings

In 2020, Buford lived with Allison and her teenaged children, F.A. and J.G. On February 10, Anderson came over for drinks and dinner at their Waterloo home. Anderson and Allison, as close as sisters, were reminiscing about a friend who recently passed away. F.A. recalled that everything seemed normal when she and her brother went upstairs to bed: "There wasn't any kind of weird mood." But before falling asleep, F.A. heard her mother's troubling statement and what sounded like gunfire. She tried to wake her older brother, who said he did not hear the shots and went back to sleep. F.A. then crept to the landing and saw Buford turn on a light.

F.A. called out to him. And he responded: "Don't come down here, don't come down here because I love you." Ignoring his wishes, F.A. continued down the stairs and onto the main floor where she saw her mother and Anderson on the dining room floor surrounded by blood. Buford was sitting in a chair holding a gun.

F.A. then returned to the second floor to wake J.G., telling him she thought their mother and Anderson were dead.

Before J.G. could respond, Buford called upstairs: "Come on, y'all." Buford took the children from the home in their mother's car, making several stops. First, he took J.G. to a friend's house. After dropping off J.G., Buford beckoned F.A. to the front seat. Buford resumed driving, telling F.A., "I love you. Do you love me, like, how a daughter's supposed to love her dad?" and "You ain't gonna love me no more, you gonna hate me."

Buford then visited the home where his children lived with their mother because "he wanted to go hug his kids." Buford remarked, "I'm dead after tonight." Buford made two more stops: his children's grandmother's house and F.A.'s sister's house. But nobody answered the door at either house. Tired of driving around, F.A. told Buford that she just wanted to go to her friend F.G.'s house. F.G. was Anderson's daughter. As soon as Buford dropped her off there, F.A. told Anderson's family that she believed Buford shot both women. Anderson's son, M.A., ran to Allison's house to see what happened. When he couldn't get inside, he called 911.

Responding officers found the bodies of Allison and Anderson. Two 9-millimeter Luger bullet casings were recovered near the women's bodies. The state medical examiner determined that Allison died from a gunshot wound through her nose, while Anderson died from a shot to her temple. Those wounds were inflicted from less than five feet away.

Later that night, F.A. related what she had witnessed to investigating officers, who issued a warrant for Buford's arrest. But he was no longer in

Waterloo. By tracking his movements and cellphone use, police suspected that Buford fled to Peoria, Illinois.[1] Two days later, Buford called the Waterloo police to ask about turning himself in. Following the advice he received, Buford surrendered to the Peoria police.

Six months later, Buford's friend Donald discovered a handgun in his garage that did not belong to him. He turned it over to the Waterloo police. Ballistics testing showed that the two bullet casings recovered at the scene of the murders were fired from that gun.

The State charged Buford with two counts of first-degree murder in violation of Iowa Code section 707.2(1)(a) (2020) and one count of flight to avoid prosecution in violation of section 719.4(4).

Before trial, the defense moved to exclude the statements that F.A. heard her mother make, arguing they were inadmissible hearsay. The district court waited to rule on their admissibility. At trial, the State made an offer of proof with its first witness, F.A. She recalled that her mother "sounded upset" when she made the statements. In urging their admissibility, the State asserted that Allison's out-of-court statements were not hearsay because they were not being offered to prove the truth of the matter asserted.

In the prosecutor's words:

> [T]he State is not offering the statement, "What are you gonna do, shoot me in the face? I don't care, I'm not scared," to prove that Tamica Allison didn't care whether she was shot in the face or

---

[1] After dropping F.A. off at Anderson's house, Buford went to the home of his friend, Lorraine and asked to use her phone. Buford used her phone to contact Vernique, whose cell phone was tracked leaving Peoria at roughly 3:00 a.m., and arriving in Waterloo around 7:30 a.m. That cell phone was then tracked returning to Peoria around four hours later.

whether or not she was scared. The factual matter and whether or not that statement was true is irrelevant. The State is offering the statements only to prove that somebody was there with a firearm, . . . the defendant's reaction to her statement and his responsive conduct to that statement, and the fact that there was a gun there.

Alternatively, the State argued that—because Allison's statement was a reaction to seeing a gun—the statement should be admissible because it would fall under the present sense impression exception to hearsay. *See* Iowa R. Evid. 5.803(1).

But Buford insisted that the State was offering Allison's statements because the truth of the implied assertions helped its case. *See State v. Dullard*, 668 N.W.2d 585, 594–95 (Iowa 2003) (discussing implied assertions). For instance, defense counsel urged that the first part of Allison's statement, "What you gonna do, shoot me in my face?" could be used to prove intent, premeditation, or malice if Buford was threatening Allison with the gun before firing it. As for the present sense impression exception, the defense argued that, because there was no way to know what Allison witnessed, it was impossible to say her statement was a real-time reaction to witnessing it.

The district court expressed "mixed feelings" about whether Allison's statements fit the definition of hearsay. But it found that the statements were admissible under the exception for present sense impressions and allowed the State to elicit Allison's statements through F.A.

After hearing four days of testimony, the jury found Buford guilty as charged. The court sentenced him to two consecutive life terms without the possibility of parole for the murder convictions and a concurrent five-year term for the flight conviction.

Buford appeals, raising a solitary question: Did the district court err in allowing the jury to hear Allison's out-of-court statements?

## II. Scope and Standard of Review

We review hearsay challenges to correct errors at law. *State v. Skahill*, 966 N.W.2d 1, 8 (Iowa 2021). Generally, hearsay is inadmissible. *State v. Veverka*, 938 N.W.2d 197, 199 (Iowa 2020). But it may be admitted if the out-of-court statement fits within an exception to the hearsay rule. *Id.* Inadmissible hearsay is prejudicial to the objecting party unless the record "affirmatively establishes otherwise." *State v. Thompson*, 982 N.W.2d 116, 121 (Iowa 2022) (citation omitted).

## III. Analysis

Buford challenges the district court's admission of Allison's out-of-court statements. He claims the statements fit the definition of hearsay and do not fall under a recognized exception.

In response, the State reprises its two-part argument for admissibility from trial. First, the State contends that Allison's statements were not hearsay under Iowa Rule of Evidence 5.801(c). The rule defines hearsay as a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted. Iowa R. Evid. 5.801(c). A statement is an oral or written assertion or nonverbal conduct intended as an assertion. Iowa R. Evid. 5.801(a).

Second, the State argues that if Allison's statements were hearsay, they were admissible as present sense impressions. *See* Iowa R. Evid. 5.803(1). That exception allows a party to offer a "statement describing or explaining an event or

condition, made while or immediately after the declarant perceived it." *Id.* The rationale behind the exception recognizes that the declarant has no chance to fabricate a statement if it "is made during or 'immediately' after the event." *State v. Dessinger*, 958 N.W.2d 590, 600 (Iowa 2021) (citation omitted).

The State adds a third alternative on appeal. It contends that the admission of Allison's statements, if improper, was harmless error. We can start and stop our analysis with this alternative. We agree with the State's position that any error in admitting the statements does not require reversal. Assuming without deciding that the statements were hearsay and did not qualify as present sense impressions, we find their admission did not affect the jury's finding of guilt. *See State v. Elliott*, 806 N.W.2d 660, 669 (Iowa 2011). And error is harmless if the State presents overwhelming evidence of the defendant's guilt. *State v. Parker*, 747 N.W.2d 196, 210 (Iowa 2008).

Even without F.A.'s testimony recounting her mother's statements, the State presented powerful proof of Buford's guilt. F.A. testified that she heard two gunshots coming from the main floor of the house. When F.A. called to him, Buford responded, "Don't come down here, don't come down here because I love you." Paying no heed, F.A. descended the stairs, where she saw both Allison and Anderson lying in pools of blood.

What F.A. saw next was true "smoking gun" evidence.[2] She saw Buford sitting near the bodies holding a silver handgun. Both women were killed by single

---

[2] The phrase "smoking gun" is attributed to Arthur Conan Doyle, author of the Sherlock Holmes detective stories. In the story "The Adventure of the Gloria Scott," the ship's chaplain is discovered standing over a dead body with a pistol in hand, which is considered compelling evidence that he committed the murder. *See*

gunshots fired two to five feet from their heads, according to their autopsies. It is more than a fair inference that Buford—the only other person on the main floor of the house—fired the weapon he was holding to kill Allison and Anderson.

And his post-shooting behavior bolstered that inference. Soon after F.A. saw the bodies, Buford hurried her and J.G. out of the house and into Allison's car. Rather than call emergency services to aid the bleeding women, Buford's instinct was to flee the scene, evidencing a guilty conscience. *See State v. Mong*, 988 N.W.2d 305, 314 (Iowa 2023) (confirming that suspect's flight may be introduced as consciousness of guilt).

After dropping off J.G. at a friend's house, Buford asked F.A. if she loved him, but suggested she was not going to love him anymore. Buford also embarked on a sentimental tour to see his children and their grandmother, making the cryptic remark that he would be "dead after tonight." His conduct displayed his awareness of the impending consequences of the murders. What's more, his decision to abscond to Peoria reflected consciousness of guilt.

Other evidence connected Buford to the murder weapon. While investigating the shootings, police searched vehicles at Allison's home. A Buick belonging to Buford was parked in the driveway. A cooler in the Buick's backseat contained a single magazine for a 9-millimeter pistol. The magazine was loaded with ten 9-millimeter Luger cartridges.[3] And it was consistent with the type of magazine used with Jimenez-brand firearms. Then, a silver Jimenez-brand

---

Ben Panko, *Thank Sherlock Holmes for the Phrase 'Smoking Gun'*, Smithsonian Magazine (July 12, 2017), https://perma.cc/SF4B-H2ZJ.

[3] Testimony established that firearms typically come with two magazines upon purchase.

handgun, along with a second magazine, turned up unexpectedly in a box in the garage of Buford's friend months after the shootings. Ballistics testing determined that gun was the murder weapon.

The strength of the State's case renders harmless any possibly erroneous admission of hearsay. We will not reverse a conviction if the State can prove the challenged evidence did not affect the jury's verdict. *State v. Rice*, 543 N.W.2d 884, 887 (Iowa 1996). The State meets that burden here. The evidence against Buford was overwhelming, and his conviction did not turn on Allison's out-of-court statements. Even if the district court did err in allowing the hearsay into the record, the error was harmless. Buford is not entitled to a new trial.

**AFFIRMED.**