# In the Iowa Supreme Court

No. 23–0413

Submitted November 13, 2024—Filed March 28, 2025

**State of Iowa,**

Appellee,

vs.

**Allan Robert Sievers,**

Appellant.

Appeal from the Iowa District Court for Pottawattamie County, Kathleen A. Kilnoski, Judge.

The defendant challenges several evidentiary rulings, including the admission of hearsay testimony allowed as an initial disclosure of abuse under Iowa Code § 622.31B(2). **Reversed and Case Remanded.**

McDermott, J., delivered the opinion of the court, in which McDonald, Oxley, and May, JJ., joined. Waterman, J., filed a dissenting opinion, in which Mansfield, J., joined. Christensen, C.J., took no part in the consideration or decision of the case.

R. Tim Jeffrey (argued) and William F. McGinn of McGinn, Springer & Noethe PLC, Council Bluffs, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellee.

**McDermott, Justice.**

Hearsay is generally inadmissible in court unless it falls within an exception in the rules of evidence or a statute. In 2022, the Iowa legislature passed a law permitting hearsay in criminal prosecutions for sex abuse when the hearsay is a statement from an alleged child victim making "an initial disclosure" of the abuse. 2022 Iowa Acts ch. 1095, § 2 (codified at Iowa Code § 622.31B (2023)). The district court in this case allowed hearsay testimony from one of the alleged victim's friends despite the defendant's objection that the testimony was not an initial disclosure of the abuse. The defendant now appeals his conviction, arguing that the admission of the hearsay was improper and prejudicial. In this case, we must resolve a question of first impression about what constitutes "an initial disclosure" of abuse under the statute.

I.

In November 2019, Leo (a pseudonym) was called to the principal's office at his high school for fighting with another student. The school summoned Leo's mother to attend the meeting. After the principal explained the school's policies on fighting, Leo's mother yelled at Leo and took away his phone as punishment. Leo then told his mother that one of her ex-boyfriends, Allan Sievers, had raped him.

Leo's mother began dating Sievers in 2010. She and Leo would intermittently spend nights at Sievers's house, and they fully moved in with him in the summer of 2013 after Sievers and Leo's mother got engaged. Sievers had four daughters from a prior relationship. During the time Leo and his mother lived with Sievers, the oldest daughter was at college, the next oldest lived with Sievers full-time until also starting college, and the younger two stayed with Sievers every other week. Leo's mother and Sievers broke off their engagement

in December 2013, and Leo and his mother moved out. Leo, born in 2004, would have been about nine years old when they lived full-time with Sievers.

After the meeting in the principal's office, Leo's mother contacted the Pottawattamie County Sheriff's Office to report the alleged abuse. A forensic interviewer at Project Harmony interviewed Leo. The sheriff's office began investigating Leo's allegations and obtained a search warrant for Sievers's house and effects. During the search, law enforcement found on Sievers's laptop a file containing photos of nude adults, all consensually taken, depicting Sievers, his then-fiancée, and other friends. The file included a single image of a child—the son of a different woman that Sievers had later dated—showing his bare buttocks. Sievers was ultimately charged with two counts of sexual abuse in the second degree in violation of Iowa Code § 709.3(2) (2009) and one count of lascivious acts with a child in violation of § 709.8.

At trial, Leo testified about how Sievers sexually abused him and about disclosures that Leo had previously made to his friends Malcolm (a pseudonym) and Nikki (also a pseudonym) about the sexual abuse. Leo admitted that he had a bad memory, but he was sure that he told Malcolm first around 2016. His "best guess" was that he told Nikki shortly after he told Malcolm. The prosecution called Nikki to testify about Leo's disclosure to her. The prosecutor argued that Nikki's testimony was admissible hearsay under the recently enacted "outcry witness statute," Iowa Code § 622.31B (2023). Sievers objected, arguing that Nikki's hearsay testimony was inadmissible as "an initial disclosure" under § 622.31B because Leo admitted he first disclosed the abuse to Malcolm, not Nikki. Sievers also argued that because the statute became effective after Sievers had allegedly committed and been charged with these crimes, the statute should not apply in his trial. The prosecution argued that the statute covers more than

just the first disclosure and that the statute applied prospectively at trial because it operated as a rule of evidence. The district court agreed with the prosecution and permitted Nikki's hearsay testimony. Although Nikki testified that she had trouble remembering certain details, she was sure that her conversation with Leo happened in 2019. In that disclosure, Leo told her that one of his mother's ex-boyfriends had sexually abused him.

The State also offered into evidence a document containing over 200 edited thumbnails of the nude photos found on Sievers's laptop, including the image of the other child. The State argued that all the images were admissible under Iowa Rule of Evidence 5.404(*b*) to prove Sievers's sexual interest in children and thus his motive to abuse Leo. Sievers argued that the images were irrelevant and unfairly prejudicial under Iowa Rule of Evidence 5.403. The district court agreed with the State and admitted the exhibit.

Sievers testified in his own defense. His direct testimony was brief, but the State, defense, and district court agreed that it opened the door for the State to ask Sievers a broad range of questions on cross-examination. The State questioned Sievers about the nude photos, instances where Sievers hung out with other men while naked, how much time he spent alone with Leo, and about Sievers's close friend Trent Suhr. The defense only objected to two questions during this cross—one about how often Sievers hangs out with men while naked and another about how he met Suhr.

When the defense rested, the State said it planned to call Suhr as a rebuttal witness. Suhr at that time was incarcerated for driving while barred. Sievers's lawyer objected to the jury seeing Suhr in prison garb and shackles. As Sievers argued, the jury had just heard Sievers testify that he and Suhr were close friends, and now the jury would see that close friend testify in prison garb,

which would unfairly prejudice Sievers. The district court told defense counsel that it would not pause the proceedings and that unless there were other clothes available, the trial would continue after a lunch break. As to the shackles, the court concluded that Suhr would remain shackled "because of the protocols for the court security folks." The trial continued with Suhr testifying in his prison garb. Suhr remained shackled behind the witness stand, but the jury did not see nor was it made aware of that fact.

The jury found Sievers guilty of two counts of sexual abuse in the second degree but lacked unanimity to convict him on the charge of lascivious acts with a child. The district court sentenced him to two concurrent twenty-five-year sentences with a mandatory minimum to serve 70% of the sentence. Sievers appealed, challenging (1) the admission of Nikki's testimony about Leo's disclosure to her under § 622.31B, (2) the admission of the nude photos, (3) the scope of the prosecution's cross-examination of him, (4) Suhr's appearance in prison garb and shackles, and (5) sufficiency of the evidence. We retained his appeal.

II.

We must first address Sievers's challenge to the sufficiency of the evidence for his conviction. If successful, Sievers would be entitled to a remand for entry of acquittal, and the remaining issues seeking a new trial would be moot. *See State v. Dorsey*, 16 N.W.3d 32, 40 n.1 (Iowa 2025). We review these challenges for the correction of errors at law, viewing the evidence in the light most favorable to the State. *State v. Brown*, 996 N.W.2d 691, 695–96 (Iowa 2023). Our review is "highly deferential to the jury's verdict," and we "affirm the jury's verdict when the verdict is supported by substantial evidence." *State v. Lacey*, 968 N.W.2d 792, 800 (Iowa 2021). There is substantial evidence whenever "it can convince a

rational jury that the defendant is guilty beyond a reasonable doubt." *State v. Reed*, 875 N.W.2d 693, 704–05 (Iowa 2016) (quoting *State v. Thomas*, 847 N.W.2d 438, 442 (Iowa 2014)).

Leo testified about the alleged abuse, and his testimony alone is substantial evidence of Sievers's guilt. *See State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019). Leo stated that Sievers stroked Leo's penis several nights in a row while no one else was in the house, and that Sievers had also placed his own penis between Leo's bare buttocks. Another evening, Sievers announced it was "naked man night" and they watched movies together while naked. Although Sievers denied these allegations, "[t]he jury is free to believe or disbelieve any testimony as it chooses." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993). Although defense counsel on cross-examination brought out inconsistencies in Leo's testimony, this does not require the "jury to conclude that the victim is not credible or that there is insufficient evidence to support a guilty verdict." *State v. Donahue*, 957 N.W.2d 1, 11 (Iowa 2021). What's more, Nikki's hearsay testimony helped resolve a timing question about a line of defense that Sievers raised about whether one of Leo's mother's other ex-boyfriends, and not Sievers, perpetrated the abuse. *See State v. Schooley*, 13 N.W.3d 608, 615 (Iowa 2024) (reasoning that a reasonable jury could use another's testimony to rule out an alternative suspect).

Even when we conclude that a reasonable jury could have found a defendant guilty under our deferential standard of review, other prejudicial error in the case may still compel reversal of a conviction. *See Trane*, 934 N.W.2d at 466 (holding that substantial evidence supported the conviction but remanding due to an evidentiary error). We thus turn to Sievers's other assertions of error in his trial.

III.

Sievers first challenges the district court's conclusion that even though Leo previously disclosed to someone else that he had been abused, his later statement to Nikki nonetheless was "an initial disclosure" of abuse and, as a result, was admissible hearsay under Iowa Code § 622.31B(2). We apply a correction-of-errors-at-law standard both to evidentiary rulings about hearsay, *State v. Skahill*, 966 N.W.2d 1, 8 (Iowa 2021), and to district court rulings on questions of statutory interpretation, *State v. Childs*, 898 N.W.2d 177, 181 (Iowa 2017). "The State, as the proponent of the evidence, bears the burden of proving an exception to the rule against hearsay applies." *State v. Jackson*, 4 N.W.3d 298, 306 (Iowa 2024). The only exception that it argued was under Iowa Code § 622.31B.

A.

Section 622.31B(2) provides, among other things, that in a prosecution for sex offenses against a child, certain evidence "shall be admitted as an exception to the hearsay rule," including:

> *a.* Testimony by the victim concerning an out-of-court statement, whether consistent or inconsistent, made by the victim to another person that is an initial disclosure of the offense.

> *b.* Testimony by another concerning an out-of-court statement, whether consistent or inconsistent, made by the victim that is an initial disclosure of an offense charged for physical abuse or a sexual offense against the victim.

Iowa Code § 622.31B(2)(*a*)–(*b*).

The State argues that "an initial disclosure," as used in § 622.31B(2), includes the disclosure to Nikki. The State latches onto the article that precedes "initial"—*an*—and suggests that the statute's reference to "*an* initial disclosure" and not "*the* initial disclosure" means there can be any number of initial

disclosures. At oral argument, the State suggested that under its reading the rule permits hearsay evidence that (1) discloses a new fact about the alleged abuse or is a disclosure to a new person and (2) occurs before law enforcement is involved.

But the State's reading places too much emphasis on "an" and too little emphasis on "initial." "An" is the appropriate article not because there can be many "initial" disclosures, but because there might not be any disclosure at all. The statute's wording contemplates the possibility that *no* disclosure is made. If there *is* a disclosure, only the "initial" one comes in. The State's reading essentially erases one-third of the words in the phrase. The adjective "initial" in this phrase does what adjectives do: it modifies a noun. Bryan A. Garner, *Garner's Modern English Usage* 23 (5th ed. 2022). "Initial" clarifies and limits a "disclosure" in the statute. The hearsay exception thus hinges in significant part on what "initial" means.

Other states' statutes and rules are generally unhelpful in defining "initial" in this context. Although other states have created statutes and rules authorizing hearsay disclosures in child sex abuse prosecutions, there is considerable variability in how the language is crafted. Of the thirty-seven states that have a hearsay exception for children involved in sex offense cases,[1] only eight specify

---

[1]*See* Ala. Code § 15-25-31 (2025); Alaska R. Evid. 801(d)(3); Ark. R. Evid. 803(25); Cal. Evid. Code § 1360 (2025); Colo. Rev. Stat. § 13-25-129 (2024); Conn. Code Evid. § 8-10(a); Del. Code Ann. tit. 11, § 3513(a) (2025); Fla. Stat. § 90.803(23)(a) (2024); Ga. Code Ann. § 24-8-820(a) (2024); Haw. Rev. Stat. § 626-1, R. Evid. 804(b)(6) (2025); 725 Ill. Comp. Stat. 5/115–10 (2025); Ind. Code § 35-37-4-6 (2024); Iowa Code § 622.31B; Kan. Stat. Ann. § 60-460(dd) (2024); Me. Stat. tit. 16, § 358(3) (2025); Md. Code Ann. Crim. Proc. § 11–304(d)(1) (2025); Mich. R. Evid. 803A(b); Minn. Stat. § 595.02(3) (2024); Miss. R. Evid. 803(25); Mo. Rev. Stat. § 491.075 (2025); Mont. Code Ann. § 46-16-220 (2023); Nev. Rev. Stat. § 51.385 (2025); N.J. R. Evid. 803(c)(27); N.D. R. Evid. 803(24); Ohio R. Evid. 807; Okla. Stat. tit. 12, § 2803.1(B)(1) (2025); Or. Rev. Stat. § 40.460(18a)(b) (2023); 42 Pa. Cons. Stat. § 5985.1(a)(1) (2025); 14 R.I. Gen. Laws § 14-1-69 (2025); S.C. Code Ann. § 19-1-180 (2024); S.D. Codified Laws § 19-19-806.1 (2025); Tenn. Code Ann. § 24-7-101 (2024); Tex. Code Crim. Proc. Ann. art. 38.072(2) (2023); Utah R. Crim. P.

the type or number of statements allowed in.[2] Some states limit the exception only to recorded statements. Alaska R. Evid. 801(d)(3); Utah R. Crim. P. 15.5(a). Others allow out-of-court statements only to rehabilitate contrary in-court testimony. Ark. R. Evid. 803(25). Others specify a time-based limitation. 14 R.I. Gen. Laws § 14-1-69 (2025) (requiring a statement be "spontaneous[]"); Tex. Code Crim. Proc. Ann. art. 38.072(2)(a)(2) (2023) (admitting only a disclosure "made to the first person"). Iowa appears to be the only state whose limiting language refers to an "initial" disclosure. Iowa Code § 622.31B.

The word "initial" is not defined in the statute. "When the legislature does not define a term in a statute, 'we look to the context in which the term appears and give it its ordinary and common meaning.' " *State v. Rhodes*, 6 N.W.3d 741, 746 (Iowa 2024) (quoting *State v. Shorter*, 945 N.W.2d 1, 7 (Iowa 2020)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012). *New Oxford American Dictionary* defines "initial" to mean "existing or occurring at the beginning." *Initial, New Oxford American Dictionary* 894 (3d ed. 2010). Similarly, *Webster's Third New International Dictionary* defines "initial" to mean "of or relating to the beginning: marking the commencement: INCIPIENT, FIRST." *Initial, Webster's Third New International Dictionary* 1163 (unabr. ed. 2002).

Applying the word's ordinary definition, an "initial" disclosure necessarily means the *first* disclosure of the offense. Marlon Brando won his *initial* Oscar for his performance in *On the Waterfront* in 1954; when he won the Oscar again for

---

15.5(a); Vt. R. Evid. 804a(a); Va. Code Ann. § 19.2-268.3 (2024); Wash. Rev. Code § 9A.44.120 (2024).

[2]*See* Alaska R. Evid. 801(d)(3); Ark. R. Evid. 803(25); Iowa Code § 622.31B; Me. Stat. tit. 16, § 358(3); Mich. R. Evid. 803A(b); 14 R.I. Gen. Laws § 14-1-69; Tex. Code Crim. Proc. Ann. art. 38.072(2)(a)(2); Utah R. Crim. P. 15.5(a).

his performance in *The Godfather* in 1972, it was not for him "an initial" Academy Award. Similarly, Usain Bolt won his *initial* gold medal in the 100-meter dash at the Beijing Olympics in 2008; to say that Bolt also won "an initial gold medal" when he won the same event at the London Olympics in 2012 or the Rio Olympics in 2016 would not simply be bizarre; it would be false.

Examples of the legislature using "an initial" to mean "first" appear throughout the Iowa Code. For instance, Iowa Code § 8C.2(9) defines "initial placement or installation" to mean "the *first time* transmission equipment is placed or installed on a wireless support structure." (Emphasis added.) Similarly, Iowa Code § 598B.102(8) defines "initial determination" as "the *first* child-custody determination concerning a particular child." (Emphasis added.) Flipping the order, Iowa Code § 203D.1(5) defines "first point of sale" to mean "the *initial* transfer of title to grain from a person who has produced the grain." (Emphasis added.) *See also* Iowa Code § 267.2(1) (creating a livestock health advisory council with three cattle producer appointees, "one of whom shall serve *an initial term* of one year, and one of whom shall serve *an initial term* of two years." (emphases added)); *cf. Initial determination, Black's Law Dictionary* 564 (12th ed. 2024) (defining "initial determination" as "[t]he *first* determination made by the Social Security Administration of a person's eligibility for benefits" (emphasis added)).

Leo undisputedly disclosed the alleged abuse in similar detail more than once before authorities were notified. Leo testified that "I know I told [Malcolm] first." His "best guess" was that he separately told Malcolm and Nikki three years before telling his mother. Leo told his mother and the school principal in November 2019, the fall of his ninth-grade year. Leo's testimony about the timing of his disclosure was called into question at trial. Although at trial Leo testified

that he disclosed the abuse to Malcolm first, Leo admitted he previously testified that he told his mother first.[3]

Nikki's testimony did not align with Leo's version of events. She said that Leo told her in 2019, when they were in eighth or ninth grade. Although Nikki admitted to not being able to remember more minor details surrounding Leo's disclosure to her ("Like where I was exactly, what time he told me, what I was wearing. I don't remember things like that."), Nikki was more confident in her memory about when the discussion took place ("But I do remember the time, like, yearwise I was told."). The record is thus not completely clear about the length of time between Leo's first disclosure to Malcolm and his later disclosure to Nikki. We do not foreclose the possibility that statements made close in time to different people might each constitute an initial disclosure for purposes of § 622.31B(2)(*b*). In this case, the evidence shows that Leo made distinct disclosures sufficiently separate in time and space, and thus the State failed to establish that Leo's disclosure to Nikki fell within the statute's exception. *See Jackson*, 4. N.W.3d at 306.

The State tries to backstop its textual reading by arguing that its interpretation advances the statute's purpose, as it allows for a hearsay exception that reflects the reality that victims often make multiple disclosures of abuse. Under this argument, multiple witnesses presenting multiple hearsay statements best promotes the statute's purposes. But adopting that reasoning requires us to assume that more hearsay is preferred to less hearsay—a dubious proposition, particularly considering the statutory text. It was well-understood

---

[3]At trial Leo testified that it had been about five years since he had lived with Sievers, but Leo admitted he previously testified that it had only been about two or three years. Similarly, at trial Leo testified that he was ten years old when Sievers and his mother split up and they moved out, but Leo admitted he previously testified that he was about thirteen when the breakup occurred. Defense counsel impeached Leo on each of these points at trial.

at common law that hearsay had little to no substantive value. *See* David L. Noll, *Constitutional Evasion and the Confrontation Puzzle*, 56 B.C. L. Rev. 1899, 1924–25 (2015) ("The importance of the oath and the best evidence principle combined in the common law's most distinctive evidentiary practice: its seemingly categorical prohibition of hearsay."). The admission of hearsay can jeopardize a defendant's constitutional due process and confrontation rights. *See, e.g., Crawford v. Washington*, 541 U.S. 36, 51 (2004) (reversing a conviction because the admission of hearsay violated the defendant's rights under the Confrontation Clause). "Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice— and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam). The State's expansive reading fails to recognize the risks such an approach presents to a defendant's constitutional right to a fair trial, which is why the burden falls on the State to prove that a hearsay exception applies in the first place. *Jackson*, 4 N.W.3d at 306.

"[W]e may not—under the guise of statutory construction—enlarge or otherwise change the terms of a statute as the legislature adopted it." *Bridgestone Ams., Inc. v. Anderson*, 4 N.W.3d 676, 685 (Iowa 2024) (alteration in original). We conclude that Nikki's hearsay testimony was not permitted under § 622.31B(2) or any other hearsay exception, and thus that its admission was erroneous.

## B.

But this does not end the analysis. We presume that erroneously admitted hearsay is prejudicial. *S.K. v. Obstetric & Gynecologic Assocs. of Iowa City &*

*Coralville, P.C.*, 13 N.W.3d 546, 561 (Iowa 2024). Yet that presumption can be overcome if we find that the record affirmatively establishes that the improper hearsay did not affect the jury's verdict. *State v. Elliott*, 806 N.W.2d 660, 669 (Iowa 2011). "One way to establish the hearsay evidence did not have an impact on the jury's verdict is to show there was overwhelming evidence on the issue for which the hearsay was introduced, making the prejudicial impact of the hearsay evidence insignificant." *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 266–67 (Iowa 2019).

The State argues that Nikki's testimony was cumulative of Leo's or his mother's testimony. That's true with respect to the limited details of the abuse itself. But in this case, one of Sievers's main lines of defense was that if Leo suffered any sexual abuse, it was perpetrated not by Sievers but by one of the other men that Leo's mother had had a relationship with. Leo's own inconsistent testimony about the timing of his alleged abuse raises questions on this point. Although at trial Leo testified that he suffered the abuse sometime between the ages of six and ten, he testified in his deposition before trial that he suffered the abuse when he was eleven years old. Similarly, although Leo testified at trial that he and his mother moved out of Sievers's home five years earlier, he previously testified that they had moved out only two or three years earlier, at which point Leo would have been twelve or thirteen years old. It was uncontroverted that Leo's last interaction with Sievers was when he and his mother moved out.

The trial evidence also established that Leo's mother had introduced into Leo's life several other men with whom she had relationships. Although she divorced his father when Leo was an infant, Leo's mother remarried and lived with another man (Chad H.) before she started dating Sievers. During this marriage, Chad H. was subject to a court order prohibiting him from having

unsupervised contact with his own children. More importantly, in 2015, Leo's mother began a relationship with another man (John M.). During this relationship, John M. stayed overnight with Leo present. Leo would have been ten or eleven at this time, which was at least a year after Leo's mother broke off her engagement with Sievers in December 2013. The timing of the abuse that Leo so vividly described was a key issue for the jury to figure out in deciding whether to convict Sievers.

Nikki's testimony helped to shed light on *when* Leo suffered the alleged abuse. Leo testified that his disclosure to Nikki occurred in 2016. Nikki testified that Leo

> got serious really quickly. And then he told me he didn't want to tell anybody yet and that it was -- I don't want to say embarrassing but it was something really personal and that he trusted me enough to tell me.
>
> . . . .
>
> . . . . He told me that his mom had a boyfriend or an ex-boyfriend that touched him *in the past* and that -- I didn't make him go into details so that's really all he told me. He was like there was touching on both ends and *he remembered it happening* a couple times and that he hadn't told his mom yet because he just didn't feel comfortable. And he was telling me because he wanted to get it off his chest and that he trusted me enough to keep it a secret until he was ready to tell people.

(Emphases added). In his own testimony, Leo stated that it wasn't until he "had sexual ed class in fifth grade" that he remembered what Sievers did to him and realized that it was inappropriate. Leo testified that he had "tried for years to bury it in [his] own head" because he "didn't want to think about it."

Based on the timing that Leo claimed his disclosure to Nikki occurred, Nikki's hearsay testimony makes it less likely that John M. was the potential perpetrator and more likely that the abuse occurred while Leo's mother dated

Sievers. Indeed, the State asserted in its closing argument that Leo was seven years old when the abuse began—a timeline consistent with Nikki's hearsay testimony. The State thus cannot affirmatively show that Nikki's improper hearsay testimony did not affect the jury's verdict.

Having concluded as much, we need not address the other points of error that Sievers raises in his appeal.

## IV.

Because the district court erroneously admitted Nikki's hearsay testimony, and because that testimony was prejudicial, Sievers must be given a new trial.

**Reversed and Case Remanded.**

McDonald, Oxley, and May, JJ., join this opinion. Waterman, J., files a dissenting opinion, in which Mansfield, J., joins. Christensen, C.J., takes no part.

**Waterman, Justice (dissenting).**

Really? We're overturning a jury verdict and giving Allan Sievers a new trial simply because the prosecutor called Nikki instead of Malcolm as the outcry witness?[4] Leo, the victim, first told Malcolm and soon thereafter told Nikki that he had been sexually abused, well before he told any adult and this criminal prosecution began. In my view, the district court properly admitted Nikki's testimony under the outcry statute, Iowa Code section 622.31B(2)(*b*) (2023), as "an initial disclosure" by Leo. The majority opinion effectively rewrites this statutory hearsay exception to replace "*an* initial disclosure" with "*the first* disclosure." I respectfully dissent.

### I. Whether Iowa's Outcry Statute Is Limited to the First Disclosure of Sexual Abuse.

The majority correctly concludes that substantial evidence supports Sievers's convictions for sexually abusing Leo. Additional facts omitted by the majority provide a better context for applying the outcry statute. Sievers began an intimate relationship with Leo's mom. In the summer of 2013, she and her then nine-year-old son Leo moved into Sievers's house in Walnut. She left Leo alone with Sievers while she worked nights as a nurse at a hospital in Red Oak. Sievers began showing Leo photos of naked women on Sievers's computer, telling Leo he viewed them "all the time." Later, when Leo was "trying to go to sleep," Sievers stroked Leo's penis while telling him he "does it to himself all the time and that it was normal." Sievers repeatedly grabbed and stroked Leo's penis and thrust his own penis between Leo's bare buttocks. This made Leo feel "strange" and "sick to [his] stomach." Sievers even held "naked man night" and had Leo

---

[4]I will use the same fictitious names adopted by the majority.

"watch[] movies completely naked" with him. The sexual abuse only ended when Leo and his mom moved out in December of 2013.

Leo realized during fifth-grade sex ed class that what Sievers did to him was wrong. But because of his sense of shame and embarrassment, Leo did not tell his mother about Sievers's abuse until years later. As Leo later testified, "I didn't want to talk about it. I didn't want to think about it. I didn't want to feel the feelings that come with it." When Leo was around age twelve, he made vague, nonspecific disclosures to two childhood friends close in time. He told Malcolm first. As Leo later recounted, Malcolm "felt the need to confide in me that he was sexually assaulted when he was little and I told him I understood where he was coming from and why." Shortly thereafter, Leo talked with Nikki, who later testified that Leo talked to her "because he wanted to get it off his chest and that he trusted me enough to keep it a secret until he was ready to tell people." There is some confusion as to precisely when Leo talked to Nikki. But Leo's disclosure to Nikki by all accounts came *before* Leo told his mom and *before* she reported it to the sheriff's department. As the State argues, that sequence matters, making what Leo told Nikki one of his "initial" disclosures well before this criminal case commenced.

When Leo was a freshman in high school in 2019, he got into a fight and was sent to the principal's office. His mom came to the school, berated him, and took away his phone. Leo, in tears, revealed Sievers's abuse to her, saying, "[M]om, the motherfucker raped me." Leo's mom immediately reported the abuse to the Pottawattamie County Sheriff. Leo underwent a forensic interview at Project Harmony. A deputy interviewed Sievers, who equivocated about whether he had touched Leo inappropriately, saying, "I don't think so or maybe in the shower . . . ." Officers executed a search warrant and found on Sievers's laptop

hard drive numerous images of nude adults together in the same folder with a photo of a boy with his buttocks bared. Sievers was charged with two counts of sexual abuse in the second degree in violation of Iowa Code section 709.3(2) (2009), and one count of lascivious acts with a child in violation of Iowa Code section 709.8. Sievers briefly testified and denied sexually abusing Leo. The jury that heard the live testimony of Sievers, Leo, and Nikki returned a verdict of guilty on both counts of sexual abuse.

The record doesn't indicate whether Malcolm was unavailable to testify. Sievers has never explained how calling Nikki instead of Malcolm as the outcry witness affected the trial's outcome. All agree Leo told Malcolm before he told Nikki. According to the majority and Sievers, that sequence requires a new trial simply because Nikki was not told first. The majority's interpretation undermines the outcry statute and creates practical problems that are easily avoided simply by recognizing there can be more than one "initial disclosure." I disagree with the majority's interpretation that would allow Malcolm alone to testify. I would affirm the district court ruling allowing Nikki's testimony under Iowa Code section 622.31B (2023).[5]

The State argues, and the district court correctly ruled, that by referring to "an" initial disclosure rather than "the" initial disclosure, the statute allows outcry testimony from someone other than the very first person the victim told. That makes perfect sense to me. As the United States Supreme Court has

---

[5]The district court correctly rejected Sievers's argument that section 622.31B cannot be applied "retroactively" to allow evidence of the victim's disclosures of sexual abuse occurring before the statute's enactment. Iowa Code section 622.31B was enacted during the 2022 legislative session, with an effective date of July 1 of that year. 2022 Iowa Acts ch. 1095, § 2 (codified at Iowa Code § 622.31B (2023)). This case was tried to the jury in December of 2022. As the majority acknowledges, this statute applies prospectively to allow outcry evidence at a trial conducted after the law's effective date. *Hrbek v. State*, 958 N.W.2d 779, 783–84 (Iowa 2021) (explaining that a statutory rule of evidence applies to proceedings that occur after its effective date).

observed, "[n]ormally, indefinite articles (like 'a' or 'an') precede *countable* nouns." *Niz-Chavez v. Garland*, 593 U.S. 155, 162 (2021). By contrast, "[i]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.' " *Doe v. State*, 943 N.W.2d 608, 611 (Iowa 2020) (quoting *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000)). Courts routinely differentiate between the meaning of statutes using the word "the" and statutes using the word "a" or "an." *See, e.g.*, *United States v. Lopez*, 4 F.4th 706, 721 (9th Cir. 2021) ("Whereas definite articles like 'the' restrict the noun that follows as particularized in scope or previously specified by context, the indefinite 'a' has generalizing force."); *Minn. Voters All. v. Off. of Minn. Sec'y of State*, 990 N.W.2d 710, 718 (Minn. 2023) (" 'The' is a word of limitation, versus the inclusive article 'a.' "); *BP Am. Prod. Co. v. Madsen*, 53 P.3d 1088, 1091–92 (Wyo. 2002) ("[T]he definite article 'the' is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.' "). The Iowa statute textually recognizes that there can be more than just one initial disclosure by the child victim.

Consider other hearsay exceptions. The present sense impression exception admits into evidence "[*a*] *statement* describing or explaining an event or condition, made while or immediately after the declarant perceived it." Iowa R. Evid. 5.803(1) (emphasis added). The excited utterance exception admits "[*a*] *statement* relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." *Id.* 5.803(2) (emphasis added). No one contends that only one such statement can be admitted into evidence under those rules. These hearsay exceptions allow more than one qualifying statement into evidence. And, as this case demonstrates, a victim of sexual abuse may

make several initial disclosures before police get involved. The prosecution should not be limited to offering only the first.

I don't buy the majority's counterargument, that the statute refers to "an" initial disclosure simply because some victims may not make *any* initial disclosures before the crime is reported. In that scenario, section 622.31B wouldn't be triggered at all. In my view, the statute's use of "an initial disclosure" allows outcry testimony from a second or third person the victim told before the abuse was reported to the police, as the State argues.

Reading the statute as a whole confirms that the district court interpreted it correctly. Iowa Code section 622.31B(2) uses both "the" and "an" in different contexts. The word "the" is used to describe who must have made the initial statement: *the* victim. *Id.* § 622.31B(2)(*a*). This refers to a specific individual. Use of this definite article limits admissibility to disclosures made by the specific victim harmed by the alleged crime. However, the statute uses a different term, "an," to precede "initial disclosure." *Id.* § 622.31B(2)(*b*). "When 'the' and an indefinite article are used within the same statutory provision, they should not be read to mean the same thing." *Maples v. State*, 968 N.W.2d 446, 451 (Mich. 2021) (en banc). By using the word "an," section 622.31B(2) contextually allows outcry testimony from someone who wasn't the first person the victim told.

The Texas outcry statute provides a useful comparison. The Texas statute allows into evidence the victim's hearsay statement, "made to *the first* person . . . to whom the child or person with a disability made a statement about the offense." Tex. Code. Crim. Proc. Ann. art. 38.072(2)(a)(2) (2023) (emphasis added). I assume that if the Iowa legislature wanted to limit admissibility to the *first* disclosure, it would have used language like the Texas statute. It did not.

The majority cites other Iowa statutes that expressly define "an initial" to mean "the first." For example, the majority observes that "Iowa Code § 598B.102(8) defines 'initial determination' as 'the *first* child-custody determination concerning a particular child.'" To me, those examples support this dissent. When the legislature wants "initial" to mean "first," it says so expressly in the statute's defined terms. Tellingly, section 622.31B nowhere defines "initial" to mean "the first." It is not our role to add in a definition the legislature omitted.

Our court should not narrow Iowa's outcry statute in the guise of interpretation. Even Texas courts applying an outcry statute that is expressly limited to "the first person" the victim told have allowed testimony by others to whom the victim later revealed more information:

> The portion of the statute catering to the hearsay prohibition demands that only the "first person" is allowed to testify. But the societal interest in curbing child abuse would hardly be served if all that "first person" had to testify to was a general allegation from the child that something in the area of child abuse was going on at home. Thus we decline to read the statute as meaning that any statement that arguably relates to what later evolves into an allegation of child abuse against a particular person will satisfy the requisites of Sec. 2(a)(2). The statute demands more than a general allusion of sexual abuse.

*Garcia v.* State, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990) (en banc); *see also Divine v. State*, 122 S.W.3d 414, 419–20 (Tex. App. 2003) (affirming ruling allowing the recipient of a second disclosure that added more detail to testify as the outcry witnesses); *Yebio v. State*, 87 S.W.3d 193, 198 (Tex. App. 2002) (holding that a conversation that "did not get into intimate details and did not go into specifics" did not qualify as the first disclosure).

The majority supports its narrower interpretation by noting the dangers of unreliable hearsay evidence and by raising the defendant's right to confront

witnesses. The majority overlooks the safeguards built into the outcry statute. Section 622.31B(3)(*b*) requires a showing of reliability, allowing the outcry statement into evidence only when "[t]he court finds, in a hearing conducted outside the presence of the jury, that the timing of the statement, the content of the statement, and the circumstances surrounding the making of the statement provide sufficient safeguards of reliability." Iowa Code § 622.31B(3)(*b*). The district court made the requisite finding as to Leo's disclosure to Nikki, stating, "I think that the timing of the statement, the content, the circumstances show enough indicia [of] reliability that the state may offer this testimony as an outcry pursuant to 622.31B." This statute also ensures the defendant has an opportunity to cross-examine the declarant by requiring "[t]he child [who made the initial disclosure] . . . testif[y] at the trial." *Id.* § 622.31B(3)(*c*). Indeed, both Leo and Nikki testified at trial and were subject to cross-examination by Sievers's counsel. Sievers raises no Confrontation Clause claim and never challenged the district court's determination that the outcry testimony satisfied the statutory reliability requirement.

The legislature enacted section 622.31B to allow victims to corroborate their account of the abuse and dispel the inference that the delay in reporting the crime to authorities casts doubt on whether it happened. *See People v. Bowen*, 699 N.E.2d 577, 584 (Ill. 1998) (noting the purpose of Illinois's outcry statute is "to provide for reliable, corroborating evidence"); *Commonwealth v. King*, 834 N.E.2d 1175, 1197 (Mass. 2005) ("[T]he primary goal of the [outcry] doctrine . . . is to refute any false inference that silence is evidence of a lack of credibility on the part of rape complainants."); *Garcia*, 792 S.W.2d at 91 (recognizing the outcry statute serves "the societal interest in curbing child abuse"). We should construe the statute to effectuate its purpose. *See* Iowa Code

§ 4.2 ("[Statutes] shall be liberally construed with a view to promote its objects and assist the parties in obtaining justice."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012) [hereinafter Scalia & Garner, *Reading Law*] ("A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored."). As the State argues,

> The whole point of this new enactment [(section 622.31B)] was to allow in *more* evidence of reliable statements that disclose abuse. A reading that gives effect to the [legislature's] deliberate choice to admit each statement that is "an initial disclosure of the offense" is the construction that "best achieves the statute's purpose, and avoids absurd results" that would render it inoperable.

(Quoting *Chavez v. MS Tech. LLC*, 972 N.W.2d 662, 668 (Iowa 2022).) The majority undermines the purpose of section 622.31B by limiting admissibility to the very first person the victim told.

We should also consider "[t]he consequences of a particular construction." Iowa Code § 4.6(5). The majority's interpretation of the outcry statute creates practical problems. What if the child victim can't remember which friend he told first? What if he told several people at once? What if he first made only vague, cryptic statements, then revealed more information later, before ultimately naming the perpetrator? Then who gets to testify? *See Divine*, 122 S.W.3d at 419 ("It is possible to have more than one outcry witness in a case, so long as the outcry is about different matters."); *Foreman v. State*, 995 S.W.2d 854, 858–59 (Tex. App. 1999) (reviewing cases that "establish the difficulty that can arise in identifying the proper outcry witness, and the broad discretion of district courts in making this determination"). The majority plays up discrepancies as to when Leo told Nikki. But perfect memories should not be expected in a statute governing initial disclosures by "a child, a person with an intellectual disability,

person with a cognitive impairment, or person with a developmental disability." Iowa Code § 622.31B(2). The State's interpretation avoids these practical problems.

Sievers argues that the rule of lenity supports interpreting this ambiguous statute in his favor. But "the rule of lenity applies only when a reasonable doubt persists *after* the traditional canons of interpretation have been considered." Scalia & Garner, *Reading Law* at 197. We rely on the rule of lenity only "as a last resort." *State v. Zacarias*, 958 N.W.2d 573, 581 (Iowa 2021). Here, by using traditional canons, one can readily determine that "an initial disclosure" under section 622.31B(2) may include a second or subsequent early disclosure, as the State argues.

In any event, Sievers cites no case holding that the rule of lenity applies to a rule of evidence. This is because the rule of lenity applies only to statutes that "define a crime, and ordain its punishment." Scalia & Garner, *Reading Law* at 296 (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820)); *see also Bittner v. United States*, 598 U.S. 85, 101 (2023) (holding that the rule of lenity applies to "statutes imposing penalties"); *State v. Hearn*, 797 N.W.2d 577, 585 (Iowa 2011) (holding that the rule of lenity applies to "statutes imposing criminal liability"). The rule is inapplicable to a rule of evidence. Because Iowa Code section 622.31B(2) does not itself impose criminal penalties, the rule of lenity is inapplicable. Indeed, the majority never mentions it.

Today's decision is a step backward for victims of sexual abuse. The majority offers no historical backdrop for outcry statutes. I find it useful to consider how the law developed by examining "[t]he common law or former statutory provisions, including laws upon the same or similar subjects." *Id.* § 4.6(4). The rationale for today's outcry statutes can be traced back to the

thirteenth century. Michelle J. Anderson, *The Legacy of the Prompt Complaint Requirement, Corroboration Requirement, and Cautionary Instructions on Campus Sexual Assault*, 84 B.U. L. Rev. 945, 947 (2004). In the Middle Ages, women who accused men of sexual assault were required to promptly report the crime, and failure to do so forfeited any legal recourse. *Id.* This was known as the prompt or fresh complaint rule. *Id.* at 965. This rule was intended to guard against women fabricating claims against men. *Id.* at 947–48; *see also State v. Kraai*, 969 N.W.2d 487, 490–91 (Iowa 2022) (reviewing the history and evolution of corroboration requirements for sexual abuse charges).

Criminal law evolved and abandoned requirements for a contemporaneous or prompt complaint to corroborate sexual assault charges. *Cf. State v. Knox*, 536 N.W.2d 735, 742 (Iowa 1995) (en banc) ("The law has abandoned any notion that a rape victim's accusation must be corroborated."). Yet courts continued to allow testimony about initial disclosures as an exception to the hearsay rule.

> [T]he prosecution was permitted to rebut any inference that the sexual assault charge was fabricated with evidence from "fresh complaint" witnesses to the effect that the complainant did in fact complain [when] the complaint was "fresh" or prompt. Hence, "fresh complaint" evidence was admitted in sexual assault trials as an exception to the usual rule that a prior statement of a witness that is merely repetitive of the witness's trial testimony is not admissible except in limited circumstances, such as on redirect examination to rehabilitate the witness after impeachment on a claim of recent contrivance.

*King*, 834 N.E.2d at 1188 (footnote omitted) (citation omitted).

Today, it is well understood that research shows that failing to immediately report a sexual assault does not mean the report was fabricated. *See* David R. Katner, *Delayed Responses to Child Sexual Abuse, the Kavanaugh Confirmation Hearing, and Eliminating Statutes of Limitation for Child Sexual Abuse Cases*, 47 Am. J. Crim. L. 1, 2 (2020). Indeed, "[t]he overwhelming body of current empirical

studies, data, and other information establishes that it is not inherently 'natural' for the victim to confide in someone or to disclose, immediately following commission of the offense, that he or she was sexually assaulted." *People v. Brown*, 883 P.2d 949, 956 (Cal. 1994) (en banc). Delayed reporting is not uncommon when the victim is a child:

> Frequently, the child victim is unaware of the wrongful nature of the conduct or that what has occurred is not "normal." The victim also often experiences feelings of confusion and guilt, the desire to forget the incident, and the fear of not being believed, and in many instances may remain silent as a result of intimidation by the abuser.

*Id.*

Delayed reports may meet skepticism, as "some may attribute allegations of sexual assault to the child's imagination or improper adult influence." *King*, 834 N.E.2d at 1195. For these reasons, the prompt complaint rule has been relaxed temporally by courts to cover the victim's prior disclosure made at any time as opposed to only a "fresh" complaint close in time to the incident. *See id.* at 1197.

Against this backdrop, the Iowa legislature enacted an outcry statute allowing the victim and a person the victim told to testify about the initial disclosure. The legislature should revisit this subject in light of today's decision that erroneously limits Iowa's outcry statute to the very first person the victim told.

Finally, I agree with the State that any error in admitting Nikki's outcry testimony was harmless. "One way to show erroneously admitted evidence did not impact a verdict is to show it was merely cumulative." *State v. Wilson*, 878 N.W.2d 203, 219 (Iowa 2016). Leo testified about what he disclosed to Nikki without objection, so her testimony is cumulative. *See In re D.D.*, No. 1–23–2321,

2024 WL 3387313, at \*6 (Ill. App. Ct. July 12, 2024) ("[E]ven if the trial court erred by admitting L.H.'s [outcry] statement to his mother, we find any error was harmless, because the statement was merely 'cumulative or duplicate[d] properly admitted evidence.'" (third alteration in original) (quoting *People v. Patterson*, 841 N.E.2d 889, 902 (Ill. 2005))). And Leo testified about how Sievers sexually abused him in great detail. "The improper admission of an outcry witness's testimony is harmless when the victim testifies about the same instances of abuse." *Moore v. State*, No. 02–23–00152–CR, 2025 WL 353068, at \*7 (Tex. App. Jan. 30, 2025) (collecting cases); *see also People v. Barkley*, 158 N.Y.S.3d 707, 708 (App. Div. 2022) (determining that any error in admitting the victim's outcry statement to police was harmless when the victim later testified under oath in a grand jury proceeding). I am convinced Sievers's jury would have returned the same guilty verdict if the outcry testimony had come from Malcolm instead of Nikki.

Because I would affirm the district court's outcry ruling, I will go on to explain why Sievers's other arguments for reversal lack merit. The majority opinion does not address these issues.

**II. Whether the District Court Abused Its Discretion by Allowing the State Leeway on Cross-Examining Sievers.**

Sievers argues that he is entitled to a new trial because the prosecutor's cross-examination of him exceeded the scope of his intentionally brief direct testimony. The State argues that Sievers opened the door to the broad scope of cross-examination, failed to preserve error, and has shown no abuse of discretion. I agree with the State.

In a failed gambit, Sievers's counsel had him give only brief testimony on direct examination. Here is his entire direct examination:

> Q. Could you please state your name for the record.

A. My name is Allan Robert Sievers.

Q. How do you feel about testifying today?

A. Pretty nervous.

Q. Were you in court over the past couple of days and did you hear all the allegations against you by [Leo]?

A. Yes, I did.

Q. Are any of the allegations that you sexually abused [Leo] true?

A. No, they are not.

Q. Are you ready and willing to answer any questions the state might have concerning your testimony today?

A. Yes, I am.

[Defense Counsel]: No further questions.

Following an unreported sidebar, the jury was excused and the court considered the proper scope of cross-examination. The prosecutor argued that Sievers opened the door wide for cross-examination:

> Your Honor, I can't think of a more broader -- a more broad question to open the door because now the state has two options, either the jury is misled because they think my hands are not tied when my hands are tied. They're going to wonder why isn't she asking about that child in the photo; why isn't she asking about that house that he purchased; why isn't she asking about that evidence he deleted. So the door was blown open.

Defense counsel's response acknowledged a "wide latitude" for the State's cross-examination:

> Well, I certainly don't agree with that, Your Honor. He testified -- the question just prior to that was are any of the allegations by [Leo] that Mr. Sievers sexually abused him true. Effectively that is the scope of his testimony. So any question related to that is wide open. That is a very wide birth. So to suggest that somehow the State's very narrow in scope testimony -- there are some restrictions based on the Court's pretrial rulings but I think that gives the state a very wide latitude in the scope of the questions it may ask.

The district court concluded, "I think the door is very wide open."

The prosecutor then cross-examined Sievers about the photos of nudity found on his computer, Sievers hanging out with other men naked, how much alone time he spent with Leo, and his close friend Trent Suhr, one of his "naked man night" companions. Defense counsel only objected to two questions—one about whether he often hangs out with men naked and another about how he met Suhr.

In my view, Sievers failed to preserve error. Sievers's direct examination was brief. He denied sexually abusing Leo and offered to answer "any" questions from the prosecutor concerning his testimony. The district court, defense counsel, and the prosecutor acknowledged that Sievers had opened the door wide. Sievers only objected to two questions during the cross-examination. He neither sought nor obtained a continuing objection to other questions. Sievers waived any error as to questions lacking a specific objection. *See State v. Davis*, 229 N.W.2d 249, 252 (Iowa 1975) (holding error is not preserved without objections to questions during cross-examination).

Sievers did object to this question: "Well, do you hang out naked with other men?" Sievers argues that the question was outside the scope of his direct testimony and irrelevant. At the time of Sievers's trial, an Iowa Rule of Criminal Procedure stated, "If the defendant is offered as a witness, the defendant may be cross-examined as an ordinary witness, but *the state shall be strictly confined therein to the matters testified to in the examination in chief*." Iowa R. Crim. P. 2.20(1) (2022) (emphasis added).[6] "This does not mean, however, that the

---

[6]After Sievers's trial, rule 2.20 was amended and no longer explicitly limits the cross-examination of a defendant to the matters testified to during direct examination. *See* Iowa R. Crim. P. 2.20(1) (2024). The rule now provides: "A defendant in a criminal action or proceeding shall be a competent witness in the defendant's own behalf but cannot be called by the State."

'prosecutor can only parrot the questions propounded on direct. Cross-examination may deal with matters inquired into on direct, and questions fairly within the area of those matters constitute proper cross-examination.' " *State v. Holmes*, 325 N.W.2d 114, 117 (Iowa 1982) (emphasis omitted) (quoting *State v. Jackson*, 259 N.W.2d 796, 800 (Iowa 1977)).

In *State v. Holmes*, the defendant testified to facts including where he was walking, how many people he passed, how many people he recognized, and the fact that he possessed a cardboard box. *Id.* at 116. During cross-examination, the prosecutor asked the defendant "if he had seen a person named Randy on the day of his arrest and if he obtained the contents of the box from him." *Id.* We held that the question fell within the scope of his direct testimony because he was not being asked questions about wholly separate events. *Id.* at 117. Rather, the questions probed specifics about the events discussed in the defendant's direct testimony. *Id.*

Here, Sievers, in his direct testimony, flatly denied Leo's testimony about abuse. Leo testified, "I remember one night we had naked man night." In my view, the district court did not abuse its discretion by concluding that the proper scope of cross-examination included probing whether Sievers ever "hang[s] out naked with other men."

In any event, we will not reverse Sievers's conviction if error was harmless. *See State v. Elliott*, 806 N.W.2d 660, 669 (Iowa 2011). "Where a nonconstitutional error [is] claimed, the test for determining whether the evidence [is] prejudicial and therefore require[s] reversal [is] this: 'Does it sufficiently appear that the rights of the complaining party have been injuriously affected by the error or that

---

*Id.* A comment to this rule states: "No substantive changes are intended from former rule 2.20(1)." *Id.* r. 2.20(1) cmt.

he has suffered a miscarriage of justice?' " *State v. Amisi*, 997 N.W.2d 683, 691 (Iowa 2023) (alterations in original) (quoting *State v. Ness*, 907 N.W.2d 484, 488 (Iowa 2018)).

As noted, "[o]ne way to show erroneously admitted evidence did not impact a verdict is to show it was merely cumulative." *Wilson*, 878 N.W.2d at 219. Other witnesses testified about Sievers spending time with other men naked. Deputy Kava testified to finding photos of naked people on Sievers's computer. Sievers admitted to taking several of those photos himself (as well as the photo of the young boy "mooning" the camera). Edited images were shown to the jury. Sievers admitted to hanging out with Suhr naked in his "man cave" "on one occasion." Suhr testified that while hanging out with Sievers, "[nudity] happened, yes." In my view, any error was harmless because the "naked man" question on cross-examination merely elicited cumulative evidence.

Sievers also objected to one other question during the prosecutor's cross-examination: "How did you meet Trent Suhr?" Sievers argued that this question was irrelevant. Deputy Kava's testimony already identified Suhr as one of the nude individuals depicted in the photos on Sievers's computer. Sievers himself had already mentioned Suhr during his cross-examination without objection. The district court acted within its discretion by allowing the additional question.

**III. Whether the District Court Abused Its Discretion by Allowing Suhr to Testify in Prison Garb.**

Sievers argues he is entitled to a new trial because his good friend Suhr testified in prison garb and shackles. It is undisputed that the jury could not see Suhr's shackles. The State argues that Sievers failed to preserve error and showed no abuse of discretion by the district court. I agree with the State.

Before Suhr testified, Sievers counsel stated:

> I think there is one issue. Based on the scope of cross, I would anticipate that the state intends to call Trent Suhr as their -- as a rebuttal witness. Mr. Suhr, I believe is still in custody. I think this is an attempt by the state to put someone who is going to be on the stand in a suit and handcuffs and say Allan is my best friend. I move for Mr. Suhr to appear in civilian clothing as well as unshackled in the presence of the jury. I understand he'll have to be accompanied by a guard. I think that's potentially appropriate.
>
> Mr. Sievers is willing to, if necessary, go to Wal-Mart and get some clothing for Mr. Suhr to wear so he has something to change into if there's nothing else available.

The court responded that if Sievers could get clothing for Suhr over the lunch break, then he could change, but that the trial would not be delayed to allow Suhr to appear in civilian clothing. After the lunch break, the judge informed both parties of the plan for Suhr's testimony.

> The plan is that he'll be -- he'll be brought in before we have the jury in because -- because of the protocols for the court security folks. He does need to be shackled but the jury will not see him walking in or out of the courtroom in shackles so he'll be sitting at the witness box when the jury is brought in.

Sievers made no further objection to this plan. Instead, his counsel simply responded with "Yes, Your Honor."

"We require that a party raise an issue and that the district court rule on it before we consider the issue on appeal." *State v. Gomez Medina*, 7 N.W.3d 350, 355 (Iowa 2024). "And even when an objection is properly raised, failure 'to obtain a ruling on the[] objection' generally 'constitute[s] a waiver of any error.' " *State v. Trane*, 984 N.W.2d 429, 435 (Iowa 2023) (alterations in original) (quoting *Bahnsen v. Rabe*, 276 N.W.2d 413, 416 (Iowa 1979)). Here, Sievers asked that Suhr testify in civilian clothes, unshackled. The district court judge offered an alternative—having Suhr seated before the jury returned but wearing his prison garb. Sievers then acquiesced without obtaining a ruling on any remaining

objection to the court's proposal. The colloquy with the court fell short of preserving error.

**IV. Whether the District Court Erred by Admitting into Evidence Photos from Sievers's Computer Depicting Nudity.**

Finally, I will explain why the district court did not abuse its discretion by admitting into evidence photos of nudity found on Sievers's computer. Police placed the images onto one contact sheet that included the photo of a young boy "mooning" Sievers and numerous photos of nude adults that were blurred by the State to mask the nudity. The State offered the images into evidence under Iowa Rule of Evidence 5.404(*b*), which provides:

> *b. Other crimes, wrongs, or acts.*
>
> > (1) *Prohibited use.* Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> >
> > (2) *Permitted uses.* This evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Specifically, the State argued that the images were offered to "show Sievers's interest in 'achieving gratification through children'—specifically, young boys"—and thereby prove Sievers's motive to sexually assault Leo. On appeal, Sievers does not argue that the images are inadmissible under Iowa Rule of Evidence 5.404. Instead, he argues that under Iowa Rule of Evidence 5.403, the photos are inadmissible because they are irrelevant and unfairly prejudicial. However, because the State as proponent of the evidence relied on rule 5.404 at trial, I will address both rules.

To determine whether evidence is admissible under rule 5.404(*b*), we apply a three-step process.

The court must first "determine whether the evidence is relevant to a legitimate, disputed factual issue." Second, the evidence must provide "clear proof" that the defendant engaged in the act. Mere speculation or hearsay is not enough, but "[t]estimony of credible witnesses can satisfy the clear-proof requirement." Finally, the court must consider whether the evidence's "probative value is substantially outweighed by the danger of unfair prejudice to the defendant."

*State v. Thoren*, 970 N.W.2d 611, 626 (Iowa 2022) (alteration in original) (citations omitted) (first quoting *State v. Putman*, 848 N.W.2d 1, 9 (Iowa 2014); and then quoting *State v. Sullivan*, 679 N.W.2d 19, 25 (Iowa 2004)). The third step involves balancing the probative value against unfair prejudice under rule 5.403, which provides, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Iowa R. Evid. 5.403.

**A. Relevance.** The first step is to determine whether the evidence is relevant to a disputed factual issue. The State asks our court to revisit a paragraph in *State v. Putman*, 848 N.W.2d at 10. Putman was charged with child molestation, which he denied. *Id.* at 4–6. The police obtained evidence of pornographic photos of children from Putman's computer. *Id.* at 5–6. The State argued that an officer should be allowed to testify about these photos under rule 5.404(*b*) as proof of the defendant's motive. *Id.* at 6. We rejected this argument, reasoning that the "State was not required to prove Putman's state of mind as an element of the crime, and Putman's state of mind at the time of the crime was not put in issue." *Id.* at 10. Accordingly, we opined that the "evidence of child pornography . . . could not be admitted for the purpose of proving

Putman's motive." *Id.* Yet we went on to hold that the child pornography evidence was admissible on the issue of the identity of the perpetrator. *Id.* at 11–16.

I agree with the State that this passage from *Putman* was wrong and should be disavowed. *See Myers v. City of Cedar Falls*, 8 N.W.3d 171, 177 (Iowa 2024) ("The course we must follow is not to ignore our mistakes, but to correct them." (quoting *State v. Kilby*, 961 N.W.2d 374, 378 (Iowa 2021))). Motive is relevant when the defendant claims he is innocent in a child sexual abuse case. As Professor Laurie Doré aptly observed:

> If the defendant says he did not do the act, his motive for doing so helps to establish that he, as opposed to someone else, did. That is, motive would seem to be "in issue" in any case in which a person claims that he or she did not commit the alleged offense.

7 Laurie Kratky Doré, *Iowa Practice Series Evidence* § 5.404:6, at 295 (2024–2025 ed. 2024). I agree with Professor Doré's analysis. When a defendant claims innocence in a child sexual abuse case, evidence of his sexual interest in children is relevant because "it tells us that [the defendant] derives gratification from this kind of activity and therefore is more likely to have engaged in it with [the victim]." *Thoren*, 970 N.W.2d at 639 (Mansfield, J., concurring specially).

Motive is relevant in many criminal cases. *See, e.g., United State v. Moss*, 34 F.4th 1176, 1189 (11th Cir. 2022) ("[M]otive . . . is always relevant in a criminal case."); *State v. Smith*, 516 P.3d 1071, 1080 (Idaho 2022) ("Evidence of motive is relevant 'when the existence of a motive is a circumstance tending to make it more probable that the person in question did the act.' " (quoting *State v. Russo*, 336 P.3d 232, 241 (Idaho 2014))); *State v. Hampton*, 855 P.2d 621, 625 (Or. 1993) (en banc) ("Although the motive for committing a crime generally need not be established by the prosecution to prove guilt, it is a relevant circumstantial fact, because it makes more probable the fact that defendant

committed the crime . . . ." (footnote omitted) (citation omitted)); *see also State v. Richards*, 809 N.W.2d 80, 95 (Iowa 2012) ("Richards' denials that he was the perpetrator put at issue all the elements of the offense. Evidence of Richards' malevolent intent toward Cyd helped to establish he was the murderer.").

Courts recognize that child pornography evidence can be admissible for this reason in a prosecution for sexual abuse of a child. The South Dakota Supreme Court recently addressed this issue in *State v. Carter*, 1 N.W.3d 674 (S.D. 2023). There, the prosecution introduced evidence that the defendant possessed child pornography to prove his motive for committing sexual offenses against children. *Id.* at 683. The *Carter* court affirmed the trial court ruling allowing the evidence. *Id.* at 686–87. While motive was not an element of the crime charged, the *Carter* court reasoned that the evidence was admissible to prove the defendant's motive because the possession of child pornography is closely correlated with a defendant's sexual interest in children. *Id.* at 687; *see also United States v. Sebolt*, 460 F.3d 910, 917 (7th Cir. 2006) ("Prior instances of sexual misconduct with a child victim may establish a defendant's sexual interest in children and thereby serve as evidence of the defendant's motive . . . ."); *Wilson v. State*, 860 S.E.2d 485, 501 (Ga. 2021) (acknowledging that motive is relevant in child molestation cases); *Kenner v. Commonwealth*, 854 S.E.2d 493, 499–500 (Va. 2021) (en banc) (holding evidence of child pornography on the defendant's laptop was relevant to proving his motive to sexually assault children).

I would hold that evidence of the defendant's possession of nude photos of children can be admitted to show a motive to engage in sexual relations with children when the defendant denies the crimes charged. I would disavow language to the contrary in *Putman*. The district court correctly ruled that the

photos on Sievers's computer depicting nude adults, which he placed in the same folders with the photo he took of the boy baring his buttocks, were relevant. The photos of nude adults corroborated Leo's testimony that Sievers showed him photos of nude adults on his computer. And the placement of the photo of the boy's bare buttocks with nude photos of adults showed Sievers's prurient interest in young boys and motive for sexually assaulting Leo. Prong one of our test is satisfied.

**B. Clear Proof Requirement.** The next step is to determine whether there is clear proof of the prior act. In my view, there was clear proof of Sievers's possession of the images the police found on his computer. Officer Kava testified that an image of a young boy "mooning" the camera was found in the same folders as nude photos of adults. Sievers admitted taking that photo of the boy and keeping it on his computer along with other photos of his nude adult friends. Prong two is satisfied.

**C. Balancing Probative Value Against Unfair Prejudice.** The third step is to consider whether the district court abused its discretion by ruling that the probative value of the photos of nude adults was not substantially outweighed by the danger of unfair prejudice to the defendant. "If the balance between the evidence's probative value and prejudicial effect is relatively close, the evidence should be admitted." *State v. Buelow*, 951 N.W.2d 879, 889 (Iowa 2020). To make this determination, our court considers the following factors:

> [T]he court should consider the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*State v. Goodson*, 958 N.W.2d 791, 800 (2021) (alteration in original) (quoting *State v. Taylor*, 689 N.W.2d 116, 124 (Iowa 2004)). In my view, the district court did not abuse its discretion by admitting the photos of nude adults.

First, because Sievers denied sexually abusing Leo, corroborating evidence is important. The fact that Sievers kept a photo of a young boy "mooning" the camera on his computer tended to show that Sievers was sexually interested in young boys. *See Sebolt*, 460 F.3d at 917. The fact that Sievers placed the photo of the young boy with bare buttocks into his folders titled "XXXTrent" and "Naked Jamie" alongside other photos displaying nudity further showed Sievers's sexual interest in young boys. An additional relevance link is the fact that a deleted folder with Leo's first name was found in the same hidden directory. Finally, the photos of adult nudity in the same folders corroborated Leo's testimony that he had been shown such photos by Sievers and confirmed that the contents of the folders were intended to satisfy a prurient interest.

Also, the degree that the jury would be prompted to decide the case on an improper basis is minimized by the fact that the photos were edited to mask nudity. Essentially, all the jury was able to see was that Sievers possessed photos that appeared to show nudity.

Nor was the probative value significantly outweighed by unfair prejudice to Sievers. "There is no question child pornography has 'a strong tendency to produce intense disgust.'" *Putman*, 848 N.W.2d at 14–15 (quoting *United States v. Loughry*, 660 F.3d 965, 974 (7th Cir. 2011)). However, "concerns about prejudice to a defendant might be eased by narrowing the scope of the prior-bad-acts evidence presented to the jury." *Id.* at 15. The jury here saw a single photo of a boy baring his buttocks and masked photos of nude adults. I would hold that the district court did not abuse its discretion in admitting this evidence.

For those reasons, I would affirm Sievers's conviction.

Mansfield, J., joins this dissent.